THE STATE OF OREGON, RESPONDENT, *v.* CHARLEY LEE, INDICTED UNDER THE NAME OF CHARLEY LEE QUONG, AND AH LEE, INDICTED UNDER THE NAME OF LEE JAW, JOINTLY INDICTED WITH LEE JONG, APPELLANTS.

MURDER—DEGREE OF CRIME—INSTRUCTIONS.—In a case of murder where the degree of the crime is not admitted by the prisoner, and there is any disagreement among the witnesses for the prosecution on the subject of premeditation, it is error for the court to charge the jury that there is nothing in the testimony tending to convict to reduce the degree of the crime from murder in the first degree, and that the jury should either find the prisoner guilty as charged or acquit him.

IDEM—REASONABLE DOUBT.—Where evidence is introduced in a criminal case to establish any proposition necessary to prove guilt, the evidence is sufficient to establish such proposition if it satisfies the jury of its truth beyond a reasonable doubt.

EVIDENCE—DYING DECLARATIONS.—The admission in evidence of dying declarations is to a certain degree in the discretion of the court that hears the witnesses.

APPEAL from Multnomah County.

This is a case under an indictment which charged the respondents with the premeditated and malicious killing of one Chin Suè Ying.

The jury found the defendants guilty as charged. From the judgment upon such verdict this appeal is taken.

Upon the trial the court below gave to the jury the instructions, among others referred to in the argument of appellants' counsel, as follows:

4. "It is one of the distinguishing characteristics of perjury that the testimony of different witnesses agree too well. No two men see a thing exactly alike, and, if they could do so, differences of temperament and of expression will give to their respective stories many points of difference. The event described in its essential features may be the same, but the narratives which describe it should be and will be different. Thus if a number of witnesses describe an occurrence as having taken place at exactly the same moment; if they locate it at precisely the same spot; if those who took part in the transaction described are described in the same attitude, speaking the same words, making precisely the same gestures; if in a case of homicide the relative position of the slayer and the slain are the same in the versions of different witnesses; if their gestures, the different blows, the different weapons employed, the struggle, and all the minute details of the occurrence are found to be exactly alike; it affords very strong grounds for presuming, if indeed it is not conclusive of the fact, that the different stories have been carefully rehearsed, and their delivery practiced beforehand; and while such previous rehearsal does not necessarily imply that the narrative is false, yet it affords strong grounds for such a presumption. Witnesses who go upon the stand to speak the truth do not find it necessary to rehearse beforehand the story they expect to tell.

5. "The fact that the false swearing has been concerted between a number of witnesses makes it all the more dangerous to society. And this is so for the reason that preparation and the association of persons for a criminal object give that confidence which makes crime aggressive and lends to falsehood the assurance of truth.

6. "I have said that the differences in the testimony of the different witnesses increases your responsibility, and

this is so for the reason that these differences involve a crime second to that concerning which you are to inquire of.   You cannot afford to let perjury succeed; your verdict is more important in this view than it is in respect to the matter of punishing the killing of Chin Sue Ying.   If witnesses in this case have banded themselves together to swear against these defendants, or to swear for them, and if they shall succeed, the law will be less able hereafter to provide safeguards against the false witnesses who will be encouraged by their success to invade the precincts of your courts and cheat justice with false oaths.

7.  ''The fact is undisputed that Chin Sue Ying, a person entitled to protection under our laws, under solemn treaty stipulations, and under the universal laws of humanity, was, in the heart of the city, in the broad light of day, in a place open to all, in the presence of a large number of persons, killed.  However atrocious this crime may be, if there are circumstances of atrocity surrounding it, it is less serious in its consequences than the perjury that has been committed in this trial, in your presence and hearing.   And while you may not be able in this proceeding to reach the false witnesses, it becomes a matter of the highest importance that the perjury which they have committed be not allowed to accomplish its purpose.

8.  '' What motive or temptation have these witnesses for the state who testify to facts tending to show the guilt of the defendants?   What motives or temptations are they under to accuse innocent persons?   On the other hand, what motives or temptations have those witnesses for the defense who testify to facts tending to show the innocence of the accused ?   What motives or temptations are they under to acquit those who are guilty.

9.  ''It is sought, on the part of the defendants, to prove an *alibi*.   When fully established, this is one of the most conclusive defenses that can be made out.   The testimony introduced for that purpose should in every case be scrutinized carefully.   It is a probable fact that guilty persons more frequently resort to this defense than to any other, and that, as has been remarked, more perjury has been com-

mitted in defenses of this description than in all other defenses interposed in criminal trials.  But while this is true, it must be borne in mind that an *alibi* is a proper defense, and that to an innocent man, as has been said, it is almost always an essential defense, indeed it may be his only defense.  While, therefore, it is the duty of the jury in such cases to scrutinize the testimony carefully, they should not discredit the defense because it is of this character.  The fact that the defense is easily fabricated and is often resorted to devolves upon the jury the duty of exercising unusual care and minuteness in considering it."

.The facts are fully stated in the opinion of the court.

*Dolph, Bronaugh, Dolph & Simon, and Whalley & Fechheimer,* for appellants:

The court erred in charging the jury, as stated in exception third, that there were "irreconcilable differences in the testimony of the witnesses for the prosecution and that of the witnesses for the defendants;" and in saying to the jury that "in this case it must be presumed that all of the principal witnesses on one side or the other have sworn falsely;" and in saying to the jury, "there has not only been rank perjury here, but there has been, if I may so speak, wholesale perjury—perjury that has evidently been concerted between witnesses."  The jury are by law the exclusive judges of the credibility of witnesses, and as to whether the differences in their testimony are irreconcilable, and the statute makes it the duty of the jury to reconcile those differences, if possible, where any exist, and they were to judge as to whether or not perjury had been committed. In charging the jury, therefore, as was done in this behalf, the court clearly invaded the especial province of the jury, and such error entitles defendants to a new hearing.  (Civ. Code, 246, sec. 673; 3 Graham & Wat. New Trials, 729, 750, 1261; 16 Gray, 505; 42 Ind. 454; 55 Ga. 456.)

The same objection and authorities are applicable to the matter contained in that portion of the charge contained in exceptions fourth, fifth, sixth, seventh, eighth and ninth, *supra,* beside that, with all due respect for his honor, the

judge of the court below, we submit that such is the evident intent and meaning of much of the language used therein, when read by the light of the circumstances of the case, that he might as well have said to the jury directly, and in fewer words, that the witnesses for the defense were all perjured, and therefore should not be believed.  As is shown by the bill of exceptions, there were but two witnesses on behalf of the prosecution who testified to having seen the difficulty in the course of which deceased was mortally wounded, while there were four witnesses for the defense who said they were also present and saw the affray.  Beside these there were two others who swore that Charley Lee Quong was below stairs in a back room at the time the difficulty occurred, and three other witnesses who testified that defendant Lee Jaw was at the same time lying sick in the wash-house, so then there were virtually eight or nine witnesses against two.  Now with this fact in mind, let us recur to some of the expressions used in that portion of the charge embraced in exceptions three to nine, inclusive.

"But it is a rare case when all of the principal witnesses upon one side or the other, when there are a number of witnesses called, must be presumed to have sworn falsely.  Yet this is such a case.  There has not only been rank perjury here, but there has been, if I may so speak, wholesale perjury—perjury that has evidently been concerted between witnesses.  The fact that the false swearing has been concerted between a number of witnesses.  If witnesses in this case have banded themselves together.  It is sought on the part of defendants to prove an *alibi.*  *  *  It is a probable fact  *  *  that, as has been remarked, more perjury has been committed in defenses of this description," etc.

Could the jury have failed to understand from such expressions that the court meant to charge them that defendant's witnesses ought not to be accredited.  The portion of the charge embraced in exception "ninth," *supra,* is erroneous, and was calculated to mislead the jury.  The law is not that the defense of an *alibi* must be "fully established" in order to avail the prisoner.  On the contrary, if the proof is such as to create a reasonable doubt as to his presence at

and connection with the commission of the crime, he is entitled to an acquittal. (*Pollard* v. *State*, 53 Mo. 410; *Binns* v. *State*, 46 Ind. 311; *Adams* v. *State*, 42 Id. 373.)

But again the court, as we submit, invaded the province of the jury by delivering such utterances as those contained in exception "tenth," *supra.* This portion of the charge is erroneous in point of fact as well as of law. Doctor Saylor was called as a witness for the state, but his evidence tends strongly to impeach the testimony of the two principal witnesses for the prosecution, and to show that the killing may have occurred under circumstances wholly inconsistent with the facts necessary to constitute murder in the first degree.

Now, that portion of the charge was necessarily based upon one of these two propositions:

1. That under our statutes the malicious and unjustifiable killing of a human being is presumed to be murder in the first degree, and evidence is required to overcome that presumption and reduce the crime to the lower grade of murder in the second degree; or,

2. That the court has the right to charge the jury that the effect of the evidence on behalf of the prosecution is to show that the killing was done of deliberate and premeditated malice, and that therefore the defendants must be found guilty of murder in the first degree unless the evidence on their behalf is such as to reduce the offense below such grade.

We submit that neither of these positions is correct or can be maintained. The presumption of law under statutes similar to ours (Code, p. 406, secs. 506, 507) is that the killing of a person purposely and maliciously is murder in the second degree. And as to whether the deed was done deliberately and of premeditation, the jury are the sole and exclusive judges. (Code, p. 275, sec. 835; *People* v. *Sanchez*, 24 Cal. 28, 30; *State* v. *Garraud*, 5 Or. 216; *State* v. *Foster*, 61 Mo. 549; *McCue* v. *Commonwealth*, 78 Pa. St. 185; 108 Mass. 296.)

Neither can the effect of such instructions be compensated by proper ones on the same subjects elsewhere con-

tained in the charge, if such there be; for it can not be known or shown which the jury accepted for their guidance, or how far they may have been misled by the erroneous instructions. (*People* v. *Campbell,* 30 Cal. 312.)

*J. F. Caples, District Attorney, and M. F. Mulkey,* for the state:

It was held in the case of the *State* v. *Garraud,* 5 Or. 220, that if there is no evidence of facts and circumstances such as would, under the law, reduce the crime charged to manslaughter, the judge may so inform the jury and may charge them that they can not consider the question of manslaughter.

It is clear that in a case where there is no testimony tending to reduce the grade of the offense below murder in the first degree it is not only the right but it is the duty of the judge presiding in the trial to tell the jury so. The jury should not be allowed to presume facts concerning which there is no testimony—to find facts without evidence. Is it true that there is no such testimony? If so, the instruction is proper; if it is not, this cause should be reversed.

The witnesses for the state who testify to having seen the killing testified that one of the defendants struck deceased a blow on the head from behind with a hatchet; that deceased turned his head in the direction of the blow, whereupon the said defendant struck him again, and that immediately or at the same time the other defendant and the third person in the indictment drew pistols from under their clothing and shot deceased twice in the front part of the body; that this was done in the Chinese joss room, which contained a large number of persons—probably a hundred persons at the time; that the person who struck with the hatchet was behind the deceased and the other defendants were at his side; that they did not see the deceased do anything except to turn his head when struck.

There was testimony tending to prove that the deceased was a member of the Chinese mission school and that he had embraced the Christian faith; that on the day before

he was killed he was at the festival at the joss house, and that while there Lee Quong requested a policeman to put him out, alleging as a reason for so doing that he had poured some offensive fluid on the floor of the room about two hours previously; that some such fluid had been poured on the floor at about that time; that the policeman, in obedience to such request by Lee Quong, took deceased from the room; that while he was escorting deceased from the room Lee Quong followed and applied an offensive epithet to the deceased in the Chinese language; that about this time or soon after, the officer having asked Lee Quong why he did not have deceased arrested if he had commited the nuisance, as Lee Quong had stated, replied, "I'll arrest him to-morrow, or I'll have him arrested to-morrow; I know him." There was no testimony on the part of the state tending to show that the deceased had done or said anything other or more than that which is here stated, or that he had in any way provoked or attempted to provoke the defendants or either of them, or to cause them to be angry with him, or that either of them thought he had done so, beyond what is here stated.

The defense sought to be established for the two defendants on trial was that of an *alibi.* For this purpose, testimony was offered on the part of the defense tending to show that they were at another place when the killing occurred, and also that the killing was done by Lee Jong alone, and that the other defendants were not present.

Upon these facts could the jury have found either of the defendants guilty in any less degree than murder in the first degree? Was there any testimony whatever to sustain such a verdict? It is stated in the instructions, if the witnesses for the defendants were to be believed, or if there was a reasonable doubt as to their having told the truth, the defendants should have been acquitted. The case could not have been more strongly stated for the defendants. Was there then anything in the testimony of the witnesses for the state tending to prove murder in the second degree or manslaughter? And in the consideration of this question let us consider whether the state's testimony tends to

show the statutory ingredients of murder in the first degree. The statute provides that if any person shall purposely and of deliberate and premeditated malice kill another, he shall be guilty of murder in the first degree. (Crim. Code, p. 406, sec. 506.)

And it further provides that there shall in such case be some other proof of malice than the mere fact of killing, and that premeditation and deliberation shall be evidenced by poisoning, lying in wait, or some other proof that the design was formed and matured in cold blood, and not hastily upon the occasion. (Crim. Code, p. 407, sec. 519.)

It is also provided that an intent to murder shall be conclusively presumed from the deliberate use of a deadly weapon, causing death within a year. (Crim. Code, p. 260, sec. 765, sub. 1.) What, then, is the law applicable in a case like this in regard to the facts to prove premeditation and deliberation necessary to constitute murder in the first degree.

In 1794, the state of Pennsylvania enacted that "All murder which shall be perpetrated by means of poison or lying in wait, or by any other kind of willful, premeditated and deliberate killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, burglary or robbery, shall be deemed murder in the first degree, and all other kinds of murder shall be deemed murder in the second degree." (Wharton on Hom. sec. 171.)

The substance of this statute is now incorporated in the codes of a majority of the states in the Union. It will be seen by a comparison between this statute and our own that the two are in all essential features alike, and that our statute, like those of a majority of the states, has been framed after the Pennsylvania statute.

Mr. Wharton says that these statutes do not touch the common law distinction between murder and manslaughter; that they simply divide murder into two classes, with the object of diminishing the area of cases in which the death penalty is applicable, by making such penalty apply to the higher of the two classes of murder. (Wharton on Hom. sec. 177.)

The construction of these statutes has been fully settled by many decisions. Mr. Wharton lays it down that under these statutes premeditation does not require positive proof of an intent prior to the commission of the act, as such prior intent may be inferred from the act. (Wharton on Hom. sec. 180, and note.) Deliberation and premeditation simply mean that the act was done with reflection and conceived beforehand. No specified length of time is required for such deliberation. It would be a most difficult task for human art to furnish any safe standard in this particular. Every case must rest on its own circumstances. The law, reason and common sense unite in declaring that an apparently instantaneous act may be accompanied with such circumstances as to leave no doubt of its being the result of premeditation. The true view is that intent and deliberation are to be inferred from facts; that they are not to be negatived because there is no direct proof of their existence prior to the fatal blow; and that the character of the weapon used, if it be used coolly and intelligently, is sufficient to give inferences by which the nature of the intent can be determined. (Wharton on Hom. secs. 180, 31, and note.)

In two or more cases covering this point the question has been thus stated: "But let it be supposed that a man without uttering a word should strike another on the head with an ax, it must, on every principle by which we can judge of human actions, be deemed a premeditated violence. (Wharton on Hom., secs. 180, 181; notes.)

In the case of *Commonwealth* v. *Green*, 1 Ashmead, 289, the accused and the person killed belonged to a marine corps. The prisoner had refused obedience to an order of the deceased, who was a drill sergeant, by whom he had been placed under arrest. At this time a difficulty occurred, and the deceased struck the prisoner, who was in the act of being taken to the guard-house, over the head with a musket. After being taken to the guard-house the prisoner got leave to go and get his head dressed. Shortly after this he returned to where the deceased was, and, seizing a musket, shot him dead. There were some threats between the affray and the shooting by the prisoner, and expressions

both of satisfaction and regret afterwards.   (Wharton on Hom., sec. 182, p. 147.)

Let us apply the doctrine of these authorities to this case. Upon the assumption that the state's witnesses are to be believed, the three persons attacked the deceased simultaneously.   The first blow was struck from behind, when the deceased turned his face, as he was caused to by the blow; the other two persons engaged in the killing shot him from the side, both shooting almost at the same moment. There was nothing to show that anything was done or said by the deceased at the time to provoke the attack.   The three persons were all within the requisite distance for the purpose of the assault at the same moment, two armed with pistols, the third with a hatchet.   Their positions were such that all could act at the same moment.   Were these things the result of accident—the concurrent assaults from different directions by three men with deadly weapons, in convenient positions about the person assaulted, there being no provocation and no suspicion by the assaulted person of a purpose to harm him?   Can these facts lead to any other conclusion than that the three were acting in concert, in pursuance of a design previously formed and matured and understood between them?   To say that all this may have been mere coincidence, mere accident, that the three may have happened, without any previous understanding between themselves, to have been at the same moment within arm's length of the deceased, that one may have happened to have been behind him while the others were at his side; that the one behind him happened to be armed with a hatchet at that particular time and happened to lead in the violence, while the others had pistols; that while the deceased was doing nothing, the three may have happened, without any previous understanding or intention, and without any knowledge on the part of either as to what the others were about to do, each hastily, and on the occasion formed the purpose to kill, and proceeded simultaneously to carry that purpose into execution—I say to assume that these things may have been the result of mere coincidence, of chance, is to discard reason and deny experience.

It must be borne in mind that the defendants do not claim that the acts described by these witnesses were justifiable or excusable, or done in a sudden heat or under provocation. Their defense disputes the facts altogether. They rest their case upon the *alibi*. But the testimony tending to show deliberation and premeditation does not stop here. The testimony shows that there was some difficulty between the deceased and one of the defendants on the day before the killing; that the deceased had renounced the religion of his race; that one of the defendants accused him of an act offensive to the Joss worshippers and to decency, and had an officer eject him from the building; that he called deceased an offensive name and said he knew him and would arrest him or have him arrested to-morrow. Here was an antecedent grudge on the part of one of the defendants and provocation as to all of them that furnishes the motives for the act.

The fact that a hatchet was used is a circumstance from which premeditated and deliberate malice may be inferred. A hatchet is an unusual weapon. It is not as a rule carried upon the person. There is nothing to show that hatchets were used or were kept near where the killing took place. It must be presumed to have been specially provided. With this hatchet the defendant Lee Jaw approached the deceased from behind and struck him a murderous blow. Does not the man who specially arms himself with an unusual and deadly weapon, and who approaches his adversary from behind, give by such acts every indication of a design formed and matured in cold blood that would be afforded by the circumstance of lying in wait?

The refinements of technical learning will have to be improved before presumptions can be found in favor of the assassin who stealthily approaches his victim from behind that do not equally obtain in favor of the one who awaits the approach of his victim in ambush.

Under these facts, it was the duty of the court to instruct the jury that there was no testimony tending to prove murder in the second degree or manslaughter. The jury would have no right to presume, in the absence of testimony, that

the killing might have been provoked or that other facts may exist that would give to the matter a different face from that which the testimony presented.

By the Court, BOISE, J.:

These appellants were indicted at the October term of the circuit court of Multnomah county for the crime of murder in the first degree, jointly with Lee Jong, who escaped and fled the country, and were tried at the same term of the court, and convicted of the crime charged, and sentenced to be hanged by judgment of said court, rendered January 4, A. D. 1879, the same being the sixty-fourth day of said term of said court, from which judgment and sentence this appeal is taken.

The facts are, briefly, that the deceased, Chin Sue Ying, was mortally wounded by two blows in the head with a hatchet and two shots in the abdomen from a pistol or pistols, in the Chinese joss house, at or about two o'clock of the afternoon of the third day of October, A. D. 1878, from the effect of which wounds he died at or about two o'clock of the morning of October 5, 1878.

That deceased had been in said joss house on the evening of the second of October, about nine or ten o'clock. Charley Lee Quong applied to a special policeman, who was on duty below stairs, to go up into the second story of the building, into the joss room, and take deceased out, complaining that deceased had burst a Chinese stink-pot on the floor. That the policeman went up stairs accordingly, and found that some dark-looking fluid had been poured on the floor, which had a very offensive odor, and the deceased, being accused by Lee Quong of having poured it there, he was accordingly put out of the house by said officer. That as he left the room Lee Quong followed as far as the door, exclaiming in an angry tone, "Ki Gi," which was interpreted to mean "a man who acts like a prostitution," and as being a term of reproach. That said officer inquired of Lee Quong why he did not have the deceased arrested, to which Lee Quong replied: "I will arrest him to-morrow," or "I will have him arrested to-morrow." That about half-past one o'clock

P. M. of October 3, the two and only witnesses for the state who claimed to have witnessed the tragedy, left their respective places of employment in the suburbs of the city and came to the store of Wing Hing & Co., about two blocks distant from the joss house. That one of said witnesses met deceased at said store and they went directly to the joss house. That the other of said witnesses, when he reached the store, followed on immediately to the joss house, and the three had been in the joss room but a few minutes when the affray occurred. That said witnesses had been in the habit of leaving their places of employment about one o'clock of each day previous to October 3.

In giving an account of the killing, Wo Jung, a witness, testified: "That he is acquainted with defendants now on trial, and with Lee Jong, named in the indictment and not on trial, and was acquainted with the deceased in his life time; that deceased was wounded in the Chinese joss house in the city of Portland; that witness was present in the joss house at the time deceased was wounded, and was standing within seven or eight feet of deceased when he was attacked by the three defendants named in the indictment; that the first thing witness saw that indicated any difficulty between the defendants and deceased was that witness saw the defendant Lee Jaw raise a hatchet and strike the deceased from behind; that the deceased turned his face in the direction of Lee Jaw, who then struck him a second blow with the hatchet; that deceased received both blows of the hatchet upon his head; that deceased was struck the first blow with the hatchet, and as he was in the act of turning his face towards Lee Jaw, the defendants, Charley Lee Quong and Lee Jong, each shot at deceased with pistols; that the pistols were fired from the side of the deceased— the witness could not tell from which side; Charley Lee Quong fired one of the pistols and Lee Jong fired the other at deceased; that the shots were fired in quick succession, the one immediately after the other; that after the second shot the deceased fell to the floor, and the witness was badly frightened and ran away; that witness is positive that deceased was first struck by Lee Jaw; that Lee Jaw was stand-

ing behind deceased when he struck him the first blow with the hatchet, and that upon being so struck deceased turned his head to one side, about which time Charley Lee Quong and Lee Jong fired pistols at him from his side, and the defendant, Lee Jaw, about the same time struck the deceased the second blow on his head with the hatchet, whereupon deceased fell to the floor and witness ran away; that there were a large number of persons present in the joss house at the time, but that there were no persons between witness and deceased at the time he was attacked and wounded by the three defendants named in the indictment; that a band of China musicians were performing upon their instruments in the joss room at the time, and there was much noise in the room; that witness did not see deceased do anything nor hear him say anything to either of defendants before he was assaulted by them." The witness also testified to the situation of the tables in the room, and some other things not necessary to mention here.

Another witness, Lun Sing, was introduced by the prosecution, who testified that he was present in the joss house at the time of the wounding, and was standing near the north wall of the room, which is opposite the side at which the difficulty occurred, which was near the south wall at the south end of the tables. This witness in describing the same says the first thing he saw to indicate trouble was that he saw Lee Jaw raise a hatchet and strike deceased on the head; that Lee Jaw was standing behind deceased at the time, the back of deceased being toward Lee Jaw, who struck him from behind, and struck him on the head with the hatchet; that this blow was on the back of the head of deceased; that deceased when struck turned his head with his face towards Lee Jaw, who then struck him a second blow with the hatchet; that deceased received this second blow on his forehead; that Charley Lee Quong and Lee Jong were standing close to deceased at the time, and witness saw both of them put their hands in their pockets and draw them out again; they each, Charley Lee Quong and Lee Jong, raised their arms, having their hands under their sleeves, and two pistols were fired in rapid succession, but

witness did not recognize by whom they were fired; they seemed to be fired from about where the defendants Charley Lee Quong and Lee Jong were standing, but witness could not recognize who fired either pistol; says he was at the north side of the room and at the north end of the same table that deceased was standing at the south end of; and that he could see him and what took place.

These witnesses, Wo Jung and Lun Sing, were the only witnesses introduced on the part of the prosecution who claimed to have been present up stairs in the joss room when deceased was wounded, and were the only witnesses on behalf of the state who testified to having seen the difficulty. Both of said witnesses testified that they were at and before the difficulty scholars in the Chinese mission school in the city of Portland, and that deceased was also a scholar in said school. Lun Sing testified that he went to the joss house with the deceased, and the other witness went there about the same time; and they had been there but a short time when the difficulty occurred.

The first witness named above, Wo Jung, testified on cross-examination that after the shooting he ran away and went to Wilbur's, where he was employed, and did not tell any one what had happened or that he saw deceased when he was hurt; said he had never told the facts to any one until the time he was then examined in court on the trial. On re-examination by the prosecution he said he had testified before the grand jury and talked with Mr. Mulkey, the attorney for the state, and given him the names of the defendants the next day after the killing, and he was also before the coroner's jury, and when asked why he ran away from the joss house he answered: "I was afraid the other side would turn to and kill me."

Dr. Saylor, a witness for the state, testified that he made a *post mortem* examination of the body of the deceased; that deceased had received two blows on the head, inflicted by some sharp instrument which witness supposed to be a hatchet; that the wounds were on the left side of the head, and both cuts penetrated through the skull into the brain. This witness also found on the deceased two gun-shot

wounds—one in the bowels, near the navel, and the other in the pelvis; that the first gun-shot wound perforated the bowels, and was the immediate cause of his death; that the wounds in the head extended from about two and one half or three inches above the eye, backward to or beyond the curve of the skull behind; that these wounds were something over half an inch apart in front and came together behind, thus forming a V shape; that in the opinion of witness either of said wounds would most probably have proved fatal, but the immediate cause of the death was inflammation from the gun-shot wound in the bowels; that the gun-shot wounds were received from the front; that either of said cuts on the head would have knocked down any ordinary man; that in the opinion of the witness both blows on the head were inflicted by a party standing in front of deceased when the blows were struck; that deceased was probably not so tall as Lee Jaw or Charley Lee Quong by two or three inches; that wounds in the head might have been given by one standing behind deceased if deceased had been sitting down at the time or had been seized and drawn backwards; but that witness is of the opinion that both blows were struck by a person standing in front of deceased at the time; witness thinks all the wounds were given by a person standing in front of deceased, and that the wounds on the head were made with a hatchet having a blade from three and one half to four inches wide.

The dying declarations of deceased were also admitted, in which deceased said that Lee Jaw cut him and that Charley Lee Quong shot him. In these dying declarations the deceased did not explain how he knew that defendants were the parties; and if the statements of the witnesses Wo Jung and Lun Sing are true, it would seem that the deceased could not have seen Lee Jaw when he struck him with the hatchet, and he would not have been likely to have seen Charley Lee Quong shoot him when stunned by a blow that penetrated his brain. So the probabilities are that if he knew these men to have been the parties he must have learned it from those who witnessed the attack.

The defendants offered evidence tending to prove that

neither of these prisoners, Lee Jaw or Charley Lee Quong, were present in the joss room at the time the wounds were inflicted. The defendants then introduced three or four witnesses, who testified that they were present when deceased was wounded and saw the whole difficulty; that deceased came to about the same place in the joss room as stated by witnesses for the prosecution, and then raised his right hand, having a piece of meat in it, which he attempted to throw at the joss; that the defendant, named Lee Jong in the indictment, was standing at the time immediately in front of deceased, between him and the joss, and about three feet distant from deceased; that when deceased raised his hand to throw the meat Lee Jong seized him with both hands by his arms and exclaimed: " Don't do that!" That thereupon a scuffle ensued between Lee Jong and the deceased, during which Lee Jong drew a hatchet from under his coat or garment behind, and struck at the head of deceased with the hatchet.

The witnesses are not certain whether the hatchet came in contact with the head of deceased at that time, but think not; that thereupon deceased, having dropped the meat, seized the hatchet with both hands and Lee John did likewise, and a scuffle ensued between them for the possession of the hatchet; that Lee Jong, unable to wrest the hatchet from deceased, let go of it with his right hand, but still held on with his left and drew a pistol with his right hand from under his clothes and shot deceased; that deceased staggered, and Lee Jong again cocked said pistol and shot him a second time; that at the second shot deceased loosed his hold on the hatchet and fell to the floor, whereupon Lee Jong put the pistol back under his clothing, and taking the hatchet in his right hand, struck deceased twice in the head with the blade of the hatchet as he lay on his back on the floor. Each of these witnesses for defendant who so testified to having seen the difficulty also testified that they did not see either Lee Jaw or Charley Lee Quong present at the scene of the difficulty, and that neither of them participated in it.

From the testimony of these witnesses, who claimed they

each saw the whole transaction, it is evident that there are different accounts as to the manner in which the wounds were given and who participated in the attack. The judge of the circuit court said to the jury in instructing them that this testimony could not be reconciled, and that perjury had been committed by the witnesses on the one side or the other, and we think he was warranted in making that statement, for the testimony of all the witnesses can not be true. There is no reason to suppose that they were honestly mistaken; but to determine who among the witnesses had sworn falsely, or how much of the testimony of each or any of them was true or false, was a question for the jury.

The testimony of the witnesses for the prosecution, who state that the deceased was struck with a hatchet from behind, does not accord with the opinion of Dr. Saylor, who gives it as his opinion that the blows came from a person standing in front of deceased, and in addition to the reasons given by Dr. Saylor, the wounds were both on the left side of the head, where they would be likely to be made by a person standing in front and using the hatchet in his right hand. If they were made by a person standing behind they would be likely to be on the right side of the head, if the person assaulting used his right hand.

The witnesses for the defense describe the transaction with unusual minuteness and precision. They say that thereupon deceased having dropped the meat he was going to throw at the joss, seized the hatchet with both hands and Lee Jong did likewise, and a scuffle ensued between them for its possession; that Lee Jong, being unable to wrest the hatchet from deceased, let go of it with his right hand, but still holding it with his left, drew a pistol with his right hand from under his clothes and shot deceased with said pistol from in front; that deceased staggered, and Lee Jong again cocked said pistol and shot him the second time; that at the second shot deceased loosed his hold on the hatchet and fell to the floor, whereupon Lee Jong put the pistol back under his clothing, and taking the hatchet in his right hand, struck deceased twice in the head with the blade of the hatchet as he lay upon his back upon the

floor. If all these witnesses saw this transaction and describe it alike in all these minute details, their testimony is liable to criticism, for witnesses to such a transaction rarely agree in details, and there was a large number present and much noise and excitement in the room. The intrinsic value of this testimony is greatly weakened by the exact agreement of each witness in these minute details, and we think the criticism thereon by the court was just and proper.

It may be that each party (for it seems there were two parties in the room at the time) has given a highly colored and partially false statement of the real facts. At any rate, it was the province and the duty of the jury to pass on the value of all this evidence on both sides and try to ascertain the real facts of the transaction from all the evidence.

After the evidence was closed, the court, among other things, charged the jury: "In this case there is no testimony tending to reduce the grade of the crime from murder in the first degree, except the testimony of those witnesses for the defense, who give an account of the killing, as they claim to have seen it. But if the testimony of these witnesses is true then these defendants were not present at all. If therefore you believe these witnesses these defendants are entitled to a verdict of acquittal. If you have a reasonable doubt as to whether or not they have told the truth the defendant should be acquitted. If you think beyond a reasonable doubt that they have not told the truth, then there is no testimony, as stated, tending to reduce the grade of the crime below that of murder in the first degree. In other words, in the testimony tending to convict these defendants there is nothing that will justify you in finding the defendants guilty in any less degree than that charged." As before indicated, the evidence on both sides was liable to criticism. The witnesses for the prosecution did not agree as to the position of the parties, when the wounds were given, and the counsel for the defense had a right to submit to the jury the question as to the entire truth of their theory, and also the theory that some truth and some falsehold had been spoken by the witnesses on each side.

That is, that if the jury should reject the theory of the *alibi* —still that the evidence tended to show that deceased was committing an act of sacrilege on the Chinese religion, which its votaries had avenged in the sudden heat of passion. This instruction puts the case to the jury by presenting each side separately, telling the jury to look at the evidence, and if they believe the witnesses for the prosecution, then it is murder in the first degree. If they believe the witnesses for the defense, then the defendants should be acquitted. But suppose the jury believed from the appearance and conduct of the witnesses on each side that they had come into court to swear through their case, and that some truth and some falsehood had been testified to on each side, and though they believed there had been a crime committed, yet they doubted as to whether it had been premeditated or had arisen in a sudden quarrel, then the defendants had a right to the benefit of such doubt. And we think the last part of this instruction which says: "In other words, in the testimony tending to convict these defendants there is nothing that will justify you in finding the defendants guilty in any degree less than that charged," is erroneous, for the jury probably understood by this the testimony for the prosecution. In that testimony the two Chinese witnesses swear that deceased was struck with a hatchet by Lee Jaw, standing behind him, while Dr. Saylor, a witness for the prosecution, gives it as his opinion from the position of the wounds that the blows were inflicted by a person standing in front of deceased, and also that either of these blows would have caused sudden paralysis and caused the deceased to fall, while the two Chinese witnesses say he stood up and looked round after he was struck. These facts had a tendency to contradict the theory that deceased was struck by a person standing behind him, which fact was the strongest one in the case to prove premeditation, which was one of the facts to be found by the jury in order to justify them in finding the prisoners guilty of murder in the first degree.

We think this instruction might have prejudiced the rights of the defendants. It is true that the court afterwards, in his instructions, told the jury that they must find the de-

fendants guilty beyond a reasonable doubt, and also, that if they believed from the evidence that either of the defendants killed or assisted in killing Chin Su Ying, and entertained a reasonable doubt as to the grade of the crime, the defendant was entitled to the benefit of that doubt, and the jury should find such defendant guilty of the lower grade.

But the court, having in the instruction referred to, first told the jury that there was no evidence tending to reduce the degree of the crime from that charged unless they believed the defendants' witnesses, we think the instruction was likely to have influenced the jury against the defendants. There is exception taken also to the ruling of the court in admitting the dying declarations of the deceased. As to this we think, as that is a matter to a certain degree in the discretion of the circuit court who hears the witnesses, that this court should not hold such a ruling erroneous unless it is evidently so, and we hold from the evidence here presented that such ruling was correct. The defendants' counsel also asked the court to charge the jury that "if the jury find that none but Chinese witnesses testify to the circumstances of the killing and as to the parties concerned in it, and the jury are in such doubt as to the credibility or truthfulness of such witnesses as to feel uncertain whether they should be believed, the jury should acquit the defendants."

This instruction was refused, and we think properly, because the word uncertain may include any doubt, whether reasonable or not. There is more or less uncertainty as to all facts attempted to be established by parol evidence. Nothing is absolutely certain that rests on the testimony of men, and where evidence is given to establish any proposition tending to prove guilt, it is sufficient if it remove all reasonable doubt.

There are many other instructions and rulings of the court which were controverted in the argument, but we think they were substantially correct. The judgment of the circuit court will be reversed and a new trial ordered.