### THE STATE *vs.* DAVID BEAUDET.

Upon a trial for an assault on *A* with intent to murder, in which the defense was that *B* and not the prisoner made the assault, evidence of threats of *B* against *A* was held inadmissible.

[Argued December 2d, 1885—decided March 26th, 1886.]

INFORMATION for an assault with intent to murder; in the Superior Court. Tried to the jury before *Stoddard, J.* Verdict guilty, and appeal by defendant on the ground of error in the rulings and charge of the court. The case is sufficiently stated in the opinion.

*E. Zacher*, with whom was *S. W. F. Andrews*, for the appellant.

*T. E. Doolittle*, State's Attorney, for the State.

LOOMIS, J. The prisoner was tried upon an information for an assault upon one Dr. Walter Zink with intent to murder. He was at the time in Dr. Zink's employ and an inmate of the family, the other members being the wife of Zink, who was very deaf, a daughter aged fifteen, and a little son much younger. The state claimed to have proved that the prisoner was present in the room with Dr. Zink a short time before the commission of the offense and was found in the house shortly after. The assault took place in the dining room of the house a few minutes after eleven o'clock in the evening. Dr. Zink at the time had upon his person two rolls of bills, one of fifty-six and the other of two hundred dollars. During the day time preceding the assault he had received sixteen or eighteen dollars from one Robert Dougherty, who then had opportunity to see one of the rolls of bills.

On the south side of Zink's house, leading from the street to the barn, is a drive-way, and on the easterly side is a fence and gate leading from the drive-way to an orchard on the south. That part of the drive-way opposite the gate consists of soft and sandy soil. Very soon after the assault, and before any other persons arrived, the prisoner and Mrs. Zink passed out of the house and with bare feet went over the drive-way and through the gate into the orchard, the prisoner going a few feet ahead. At a place about fifteen feet beyond the gate Mrs. Zink discovered on the ground a roll of bills, consisting of two hundred dollars. She also

picked up a watch beside the drive-way, and some bills in the dining room, and the prisoner also picked up some silver money there. They both returned into the house and made no further search. Early the next morning the impression of bare feet of human beings was noticed in the sand of the drive-way leading to and from the gate into the orchard. They were examined by the coroner of the county and by others, and at the coroner's suggestion Dougherty and the prisoner made impressions on the sand with their bare feet, which were measured and compared with those on the drive-way. The latter indicated that the second toe was somewhat longer than the first. The experimental impressions made by Dougherty were nearly the same as those found on the drive-way, while those made by the prisoner were a quarter of an inch less in length and a little less in width, but no other difference was mentioned. At about ten o'clock on the evening of the assault Dougherty was in the Linsley House, situated from twelve to fifteen hundred feet distant, and remained there until half past ten, when he left, and was last seen near there on the railroad track very drunk, staggering, and on the road to his house. In addition to the other circumstances the state relied upon the confession of his guilt by the accused, as shown by the testimony of two witnesses.

Upon the trial a witness was asked " whether Dougherty upon that night in that saloon, between the hours of half past nine and half past ten, made any threats against Dr. Zink?" and another witness was asked " whether on the day before the assault, Dougherty in his hearing made any threats against Dr. Zink?" Both questions were excluded by the court and exception taken by the defendant's counsel; and this ruling presents the only question for review.

At the outset it should be noticed that the offer was simply to prove the threats of Dougherty against Dr. Zink. Any threats of any kind would have filled the offer. What act Dougherty threatened to do, or when or how he was to do it, was not indicated; nor was the offered evidence accompanied with any claim, or even a hint, that it could or would

be supplemented by further testimony. Indeed, it no where appears in the record that it was even claimed in behalf of the prisoner that Dougherty committed the offense or that any evidence admitted or to be offered would show it. The threats, whatever they were, so far as appears were entirely isolated from the transaction in question, and tended in no way to elucidate or give character to any material act or fact in the case. They could not therefore have been received as parts of the *res gestæ*. As to the threats in the saloon, the only thing it would seem which they characterized was the drunken condition of the one who uttered them.

We will first consider whether the exclusion of this evidence injuriously affected the accused. If it could not properly have changed the result, then he was not aggrieved by the ruling. In this part of the discussion we assume, as the record justifies us in assuming, that no further evidence affecting Dougherty was to be offered. If then we supply the additional fact of threats made, and assume, for the benefit of the accused, beyond what the record states, that they were threats of personal violence, could they by any possibility have shown Dougherty guilty of the attempted murder, so as to relieve the accused? Would the offered evidence have rendered any of the circumstances relied upon by the state inconsistent with the guilt of the accused or consistent with his innocence? Would it have accounted for the money found in the very path the accused took that night, soon after the offense was committed, and immediately after it was discovered, as the state claimed, that Dr. Zink had recovered his consciousness? Could it possibly have tended to show that the accused had no peculiar motive hastily to rid himself of the fruits of the crime which Dougherty might not also have had? It does not seem to us possible that the proposed evidence could have impaired in the least the circumstantial evidence against the accused; and surely no one would claim that it could affect the evidence derived from the confessions of the prisoner. In regard to the evidence furnished by the coroner's experi-

ment with the tracks, it may not be amiss to remark that its only possible bearing would be to furnish presumptive evidence that Dougherty and not the accused went there that night soon after the offense was committed, but there seems to have been direct evidence to show that the accused went over the drive-way in his bare feet, as did Mrs. Zink also, and it is pretty certain that they made impressions on the soft and yielding sand opposite the gate; and the differ-ence in size which the measurements indicated could be readily explained by the fact that in one case the impres-sions were made while standing still and in the other when moving rapidly forward.

But the counsel for the accused in substance claimed before this court that the state relied upon opportunity to commit the crime in the absence of any motive attributed to the accused, and that the excluded evidence would have .shown both motive and opportunity in another, and there-fore if received would have weakened the case for the state. Waiving any criticism on this imperfect statement of the claims of the state, we suggest that the threats had no bear-ing at all upon the question of opportunity. The opportu-nity of the accused, though obviously better than that of any one else save Mrs. Zink, was far from being exclusive. It was quite possible for Dougherty or others to be there. Now as to the motive relied upon by the state, it was not hatred or revenge, but love of money. We should not expect a person impelled by such a motive to utter threats at all; he would go stealthily to assail his victim. In this point of view the threats uttered by Dougherty, if they might otherwise have indicated ill will on his part, could not have affected the motive that moved the accused or have weakened the evidence relied upon to connect him with the crime.

But we will forbear further discussion of this aspect of the case, as it is not necessary to place our refusal to grant a new trial on this ground, and proceed to consider the pre-cise question raised by the appeal, namely, were the threats of Dougherty admissible at all under the circumstances

stated? and if so, upon what principle? The only plausible ground for the admission is, that as the accused might exculpate himself by showing that another was the guilty party, so any item of evidence which would have been admissible had such other person been on trial, should be received in his favor. We concede the premises, but not the conclusion; for under the rules of evidence it makes a vast difference whether declarations offered in evidence come from the party on trial or not. In the one case they are universally admitted, unless irrelevant or self-serving. In the other they are by general rule excluded, subject to a few well marked exceptions. In 2 Best on Evidence, § 506, under the head of "*Res inter alios acta*," it is said:—"No person is to be affected by the words or acts of others, unless he is connected with them either personally or by those whom he represents or by whom he is represented." Were this a civil suit in favor of Dr. Zink against the same defendant for the same assault, would it occur to any one to offer the declarations of Dougherty that he intended to do the act, or even that he had done it? Is it any the less a matter *inter alios* when the state is a party? In either case it would be a legitimate defense that another person had committed the deed, but in neither would his threats alone be admissible.

Now to illustrate some of the reasons for such distinction we will add, that where the threats of the one on trial are adduced against him he is always present in court to deny or qualify them, to show that the witness misunderstood, misremembered or was false, or to explain how the threats were uttered in a transient fit of anger or from mere bravado or for intimidation; but where the threat of a third person is introduced he may be far away, and no one can explain its real meaning; and besides, the very introduction of such a collateral issue serves greatly to confuse and mislead the triers, and justice may thereby be defeated. And if the jury were to pass on the collateral issue, it would have no other effect than to acquit the one on trial; the third person could be in no wise legally affected. If he

should afterwards be indicted, and put on trial for the same offense, he would still be at full liberty to show his innocence, notwithstanding the fact that the former finding of his guilt caused another's acquittal. And so if he had previously been tried and acquitted, that fact could in no wise affect the admissibility of his declarations when afterwards another person is on trial for the same offense, for the latter would be no party to the verdict. It is therefore going far enough in favor of the accused to allow him to exculpate himself by showing the fact of another's guilt by some appropriate evidence directly connecting that person with the *corpus delicti*. The animus of a third person is no defense, and by itself it cannot prove the ultimate fact which is a defense. Even as to the threats of the person on trial, Wharton, in his Criminal Evidence, 8th ed., § 756, says they "are admissible in evidence, not because they give rise to a presumption of law as to guilt, which they do not, but because from them, in connection with other circumstances, and on proof of the *corpus delicti*, guilt may be logically inferred." Then follows a list of infirmative suppositions, designed to show that because one threatens to commit a crime it does not follow that such intention really existed in his mind, much less does it show the actual commission of the crime. Nearly all treatises on evidence contain similar cautions. In 3d Bentham's Judicial Evidence, 75, it is said that "declarations of an intention to commit a crime are no less susceptible of being false than declarations of the opposite cast, namely, declarations of an intention to abstain from the commission of that or a similar crime."

We insist therefore that it is reasonable to exclude the mere disconnected threats and declarations of third persons. If they are parts of the *res gestæ*, or form links in a chain of evidence connecting with the crime itself, they may doubtless be received. If the threats were to commit a crime in a particular mode, and it was in fact so committed, perhaps they would then be admissible. But in the case under consideration there is nothing at all to show that the thing threatened had any sort of resemblance to the thing done either in kind or mode.

But if we suspend our discussion of the principles which ought to be applied to the question and pass to the consideration of the decided cases as found in other jurisdictions, we shall find the ruling of the court vindicated not simply by the preponderance of judicial authority but by absolute unanimity, save in one case in Louisiana, which for reasons to be suggested hereafter can have little weight in the opposing scale.

We will first cite cases precisely analogous to the case at bar in that threats of third persons prior to the commission of the crime were offered in evidence by the accused and excluded; but the threats, instead of being vague and indefinite, as in the case at bar, were generally very specific and significant.

The case of *State* v. *Davis*, 77 N. Car., 483, was an indictment for murder. On the trial the prisoner proposed to prove by one Peck "that George Nicks had malice toward the deceased and had a motive to take his life, and opportunity to do so, and had threatened to do so before the court." He further offered to prove by one Rice "that one Peck took a gun and went in the direction of the house of the deceased sometime before the deceased was killed." The court says: "Both exceptions are untenable and have been repeatedly so held by this court; the first, because they are declarations of a third party and are *res inter alios acta* and have no legal tendency to establish the innocence of the prisoner, and the second for the same and the additional reason that the time is too vaguely and indefinitely set forth. * * * Such evidence is inadmissible because it does not tend to establish the *corpus delicti*. Unquestionably it would have been competent to prove that a third party killed the deceased, and not the prisoner. But this could only have been done by proof connecting Peck with the *fact*, that is, with the perpetration of some deed entering into the crime itself. Direct evidence connecting Peck with the *corpus delicti* would have been admissible. After proof of the *res gestæ* constituting Peck's alleged guilt had been given, it might be that the evidence which was offered

and excluded in this case would have been competent in confirmation of the direct testimony connecting him with the fact of killing. No such direct testimony was offered here. It is unnecessary to elaborate, as the questions of evidence here made have been fully discussed and decided by this court in many cases. It is only necessary to refer to the principal ones. *State* v. *Bishop*, 73 N. Car., 44; *State* v. *May*, 4 Dev., 328; *State* v. *Duncan*, 6 Ired., 236; *State* v. *White*, 68 N. Car., 158."

These cases are all pertinent and supported by similar and some additional reasons. We will not take the time and space necessary for a particular statement of the evidence offered and the reasoning of the court sustaining its exclusion. To the above list we will add the case of *State* v. *Haynes*, 71 N. Car., 79.

In *Crookham* v. *The State*, 5 W. Vir., 510, it was held that it was no error to exclude testimony offered by the prisoner to the effect that another and a different person from himself had made threats to kill the deceased, just before the commission of the offense with which he was charged, and that immediately after the offense such other person left the country and has not since been heard from.

In *Boothe* v. *The State*, 4 Texas Ct. of App., 202, and in *Walker* v. *The State*, 6 id., 576, both being indictments for murder, it was held not competent for the accused to prove that a very short time before the homicide a person other than the accused made threats to take the life of the deceased. In the last case the court supported the ruling by saying:—" The issue of the trial was the guilt or innocence of the defendant on trial. Evidence is admissible if it tends to prove the issue, or constitutes a link in the chain of proof; and this seems to be the limit, and excludes all evidence of collateral facts, or those which are incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute; and for the good reason stated for the rule by Mr. Greenleaf, that such evidence tends to draw away the minds of the jury from the point in issue and to excite prejudice and mislead them. 1 Greenl. Ev., secs. 51, 52."

We may add that the doctrine of these cases has received the recent approval of jurists and text writers of high authority. Wharton, in his treatise on Criminal Evidence, § 225, says that "evidence of threats by other persons is inadmissible." The same doctrine is found in Wharton on Homicide, § 693. In 2 Bishop on Criminal Procedure, § 623, it is said:—" The declarations of the deceased, as of any third person, when not of the *res gestæ*, or dying declarations, or communicated to the defendant so as possibly to influence his conduct, are excluded by rules which have been supposed to promote justice on the whole ; at all events, which have become parts of the common law, not within the discretion of the courts to set aside. Hence they are not admissible." And again, in the first volume of the same treatise, § 1248, it is said:—" In general what one says, as for example, that he committed the crime in question, will not be admitted for or against another."

In further support of the ruling complained of we adduce a few of the numerous decisions holding that admissions of third persons, that they and not the accused are guilty of the crime charged, are to be excluded.

In the early case of *Commonwealth* v. *Chabbock*, 1 Mass., 143, the prisoner was tried on an indictment for breaking into a house, and also for stealing goods therein. The defendant offered to prove by a witness present that another person had owned to the witness that he had stolen some of the articles mentioned in the indictment. The court held that the evidence could not be admitted, saying:—" It was no more than hearsay. If a person other than the defendant had stolen the goods it was undoubtedly competent to the defendant to prove the fact in exculpation of himself, but not by the mode of proof now offered."

In *Smith* v. *The State*, 9 Ala., 990, the prisoner (a slave) was indicted for the murder of one Edmund (also a slave). All the evidence was circumstantial. Sam, another slave, had been tried and acquitted for the same murder previously. On the trial it seems there was a strong array of circumstantial evidence against him, but Sam stated that a

few days after the murder Smith told him that he killed
Edmund.   The particulars of the statement we omit.   But
on the trial of Smith evidence was offered in his behalf that
Sam during his own trial had become alarmed and had told
the witness that he had wrongfully accused Smith of the
murder of Edmund and he did not wish to die with a lie in
his mouth.   The counsel for the accused claimed that it
was competent for the prisoner under the circumstances to
show that another committed the murder, and that in this
view the declarations of Sam should have been received, as
they tended to inculpate him as well as to show that the
prisoner was not the offender.   ORMOND, J., in delivering
the opinion of the court, said:—" Conceding the true mean-
ing of these declarations of Sam in jail to be an admission
of his own guilt and that he had killed Edmund himself, it
does not vary the case in the slightest degree. * * * The
declaration of Sam was not an act within the meaning of
the doctrine I have been discussing. * * * To give effect
to the mere declarations of third persons would be a most
alarming innovation upon the criminal law.   Such a de-
claration would not be obligatory on the person making
it.   He might afterwards demonstrate its falsity when
attempted to be used against him.   Such testimony may be
a mere contrivance to procure the acquittal of the accused."

In *West* v. *The State*, 76 Ala., 98, the question was again
before the highest court of the same state, and it was held
" that the admission of a third person that he committed
the offense with which the accused was charged, not made
under oath, though on his death bed, is mere hearsay, and
is not admissible as evidence for the accused."

In *Sharp* v. *The State*, 6 Texas Ct. of App., 650, it was
held no error to refuse to allow a witness for the defense to
testify that certain other men confessed that they committed
the crime.   A similar ruling was also sustained in *Rhea* v.
*The State*, 10 Yerg., (Tenn.,) 258.

*Greenfield* v. *The People*, 85 N. York, 75, was an indict-
ment for murder.   Upon the trial the accused offered the
letter of one Royal Kellogg to his brother, in which, after

State v. Beaudet.

alluding to the murder, he said among other things, "If they want me they can come and get me," and in connection with the above and with certain anonymous letters containing confessions, they offered the declarations of Kellogg and his brother and another person, made within an hour after the murder and at a place three fourths of a mile distant. The witness being awakened by the barking of a dog at about four o'clock in the morning, on looking out the window recognized the two Kelloggs and one Taplin, and they had a gun and a bag, &c. The witness, after giving in detail their suspicious actions at this place, was offered to prove that Taplin said to the Kelloggs on that occasion before they left—" You were damned fools to do it," and that one of the Kelloggs replied—" If we had not done it we should all have been hung." MILLER, J., in delivering the opinion of the court said:—" Even if this letter could be regarded as a confession of Kellogg that he committed the murder, it was only the declaration of a third party, merely hearsay testimony, and upon no rule of evidence admissible. If such declarations were competent upon any trial for homicide they would tend to confuse the jury and to divert their attention from the real issue. The letter did not tend to establish that Kellogg committed the offense, was not a part of the *res gestœ*, and in no sense relieved the prisoner from the charge for which he was upon trial, or raised any presumption that Kellogg was the guilty party. Confessions of this character are sometimes made to screen offenders, and no rule is better established than that extra-judicial statements of third persons are inadmissible. Wharton on Evidence, § 644; Wharton's Crim. Law, §§ 662, 684; 2 Best on Evidence, §§ 559, 560, 563, 565, 578. * * * While evidence tending to show that another party might have committed the crime would be admissible, before such testimony could be received there must be such proof of connection with it, such a train of facts and circumstances, as tend clearly to point out some one besides the prisoner as the guilty party. Remote acts disconnected and outside the crime itself cannot be sepa-

rately proved for such a purpose. In considering the question we have carefully examined the numerous authorities cited to sustain the position that the evidence was competent, and none of them hold that under such circumstances it could lawfully be received, and it was neither admissible alone nor in connection with the letters referred to."

In Wharton's Criminal Evidence, § 225, it is said:—"Extra-judicial statements of third persons cannot be proved by hearsay, unless such statements were part of the *res gestæ*, or made by deceased persons in the course of business, or as admissions against their own interest, or are material for the purpose of determining the state of the mind of a party who cannot be examined in court. * * * Hence, on an indictment for murder the admissions of other persons that they killed the deceased or committed the crime in controversy, are not evidence; and evidence of threats by other persons are inadmissible. * * * On an indictment for larceny also, declarations of third parties that they committed the theft are inadmissible."

In all the numerous cases we have examined where threats of third persons were excluded, there was no dissenting opinion in any instance, and after most diligent search we have been able to find but one case which furnishes any support to the claim of the accused. We refer to that of *State* v. *Johnson*, 30 Louisiana, 921, where the state, in a prosecution for murder based entirely on circumstantial evidence, found it necessary to trace to the accused a motive for the homicide in a previous quarrel with the deceased, when the accused while in liquor uttered threats against the deceased, and upon cross-examination the witness for the state, who had in chief testified to the quarrelsome character of the deceased and to the threats of the accused, was asked " what other quarrels the deceased had besides that with the accused, a few days prior to the murder; " and the trial court excluded it. The court of review cites no authorities and enters into no discussion of the question upon principle, but simply says in effect that although it was of doubtful admissibility, yet on the whole they will give the accused the benefit of a new trial.

But even this case can be widely distinguished from the one on trial. The state had put in issue the quarrelsome character of the deceased, and to that extent the cross-examination was pertinent, and further, the case seemed to be controlled by the question whether the motive arising out of a recent quarrel pointed exclusively to the accused ; the fact drawn out on cross-examination might show that it did not, and therefore there was some force in the claim that it was admissible in order to weaken that evidence by showing that others were also included and shared the same motive. But in the case at bar we have already called attention to the fact that the motive which moved Beaudet was entirely different from that attributed to Dougherty, and hence the evidence as to the latter in no way impaired that applicable to the former.

In regard to the admissibility of the confessions of guilt by third parties in criminal trials, there is absolute unanimity in the decisions so far as we have been able to ascertain. In *Smith* v. *The State*, (supra,) GOLDTHWAITE, J., dissents from the majority opinion, but in so doing he expressly concedes " that the confession of a third person of his guilt is not evidence in favor of another, when standing alone, unaided by other facts and circumstances " ; yet he contends that " it is so whenever the party confessing is connected with the crime by strong presumptive circumstances." We find also a qualification of the doctrine in the dictum of a distinguished reporter. It is found in a note to the case of *Speare* v. *Coate*, 3 McCord, (S. Car.,) side page 232, where the reporter gives a summary of the exceptions to the rule excluding hearsay evidence, and in paragraph twelve says :—" So confessions *in extremis* that the person himself had committed a forgery of which another was indicted is admissible," citing as authority *Clymer* v. *Littler*, 1 W. Black. R., 345. The reporter then adds his own opinion :—" So I should think that where a person comes forward, and confesses the crime, and surrenders himself to justice, such confessions would be admissible evidence for a prisoner accused of the same offense." It should

be observed that stress is placed on the fact that the person confessing also surrenders himself to justice, implying that the confession alone would be insufficient, but we ought also to add that the principle of the case cited from 1 W. Black., 345, which led to and suggested the proposition just referred to, owing to some oversight or mistake was stated in an erroneous and most misleading manner. It would be supposed upon reading the note of the case that upon the trial of one person indicted for the crime of forgery the confessions *in extremis* of another person were held admissible in defense of the person on trial. But it was no such case. On the contrary it was a mere civil action based upon a controversy between adverse claimants to property under two different wills of one Clymer, deceased. The action was ejectment. The plaintiff claimed under a will made in 1743. The defendant claimed under the heir at law by an instrument dated in 1745, very imperfect in form, but purporting to have been subscribed by Mr. Clymer, and to give the property as follows:—"Whereby, in consideration of natural affection, he covenants and agrees" (but with nobody) "that the" lands in question "shall go and be given to his wife for life, and then to Elizabeth, wife of William Medlycott," (she being also his heir at law,) "and her heirs forever." It was attested by the said William Medlycott and Elizabeth Mitchell. The first will was concealed, and William Medlycott took possession under the last one in right of his wife, but on his death-bed in 1746 he declared that the instrument of 1745 was forged by himself, and he produced from under the bed-clothes the first will of 1743, and caused it to be sent to the parties interested, who had it proved, and who then brought this suit, and this evidence without any objection went before the jury in connection with the inspection of the two wills, and a verdict was rendered for the plaintiff. Lord MANSFIELD, in giving the opinion of the court on this point, simply says:—"The testator died in 1746. Both wills in the custody of Medlycott. The other subscribing witness dead. His wife to be benefitted under it. He, on his death-bed, sends the lessor of

the plaintiff his title, which is inconsistent with that under which the defendant claims. Under all these circumstances I think it admissible evidence. No general rule can be drawn from it. No objection was made to its production. It came out, it seems, on the cross-examination of the defendant's counsel. Unless therefore manifest injustice had been done on the whole case there is no ground for a new trial. There appears to be good reason for the verdict."

A further criticism of the proposition referred to may be found in 2 Phillips on Evidence, (4th Am., from 7th London edition, Cowen and Hill's notes,) p. 703, note 493 :—" And if an actual surrender should make the declaration admissible, it would at once throw open the door for fraudulent testimony, even in exculpation of the most atrocious criminals. The self-accuser is yet to be tried, and he may act under the full consciousness of having such clear proofs of his own innocence, an alibi, or some other evidence, that he would be risking but little by doing the whole as an act of solemn trickery in behalf of his friend. The surrender would not estop him. Even should the people prosecute, convict and execute him as the sole malefactor, the verdict would not estop them nor be any evidence whatever against the first accusation. It would be *res inter alios*."

There was no error in the ruling complained of.

In this opinion the other judges concurred.