[Decided June 29, 1893.]

## STATE *v.* FLETCHER.

[S. C. 33 Pac. Rep. 575.]

1. DYING DECLARATIONS — EVIDENCE.— To render dying declarations admissible in evidence they must appear to have been made under a sense of impending death and when the deceased had no hope of recovery; but such a belief may be inferred from circumstances, and need not have been expressly stated by the deceased. Within this rule statements made by one in a semi-comatose but conscious condition, suffering from a mortal gunshot wound from which he never rallied, and which speedily proved fatal, who has declared at intervals that he cannot live, and has previously said that he could not, because he was "hurt too bad," are admissible in evidence as dying declarations.

2. IMPEACHMENT — EVIDENCE — HARMLESS ERROR.— The exclusion of evidence tending to impeach a witness by showing inconsistent statements at other times, is harmless, where the witness himself admits having made such statements.

3. EVIDENCE OF EXPERIMENTS.— The result of experiments with a pistol and some cartridges found on a defendant made for the purpose of showing that a ball from such pistol would penetrate further into the woodwork of the room where deceased was shot than would balls fired from the pistol with which the killing is claimed to have been done, cannot be admitted in evidence unless it is shown that the conditions of position, distance, etc., were the same in both cases. *State* v. *Justus*, 11 Or. 179, approved and followed.*

4. EVIDENCE — STATEMENTS OF OTHER PERSONS — HEARSAY.— While it is admissible to show that another person committed the crime with which the defendant is charged, it must be by evidence directly connecting such person with the occurrence itself; but remote acts, disconnected and outside of the crime itself, confessions of others, and the like, are purely hearsay, and are inadmissible. Under this rule evidence is inadmissible on a trial for murder, that another person than defendant had threatened to kill the deceased, and that on the morning after the killing he said that he had killed him, that at the time he had on clothing corresponding to that worn by the murderer as described by a witness, and was seen coming from that direction four or five hours after the crime was committed.

Umatilla County: JAS. A. FEE, Judge.

Defendant appeals.    Affirmed.

*Leasure & Stillman*, for Appellant.

*NOTE.— See, also, the case of *Leonard* v. *Southern Pacific Co.* 21 Or. 556 (15 L. R. A. with note; 28 Pac. Rep. 887).— REPORTER.

*Geo. E. Chamberlain,* attorney-general, and *Chas. F. Hyde,* district attorney, for the State.

MR. JUSTICE BEAN delivered the opinion of the court:

The defendant, Frank Fletcher, appeals from a judgment of conviction of murder in the second degree in killing one Charles Petre, and assigns error in the admission and rejection of evidence by the trial court.

1. A question is made that the *ante mortem* declarations of the deceased were improperly admitted, because, it is claimed, the evidence does not show that they were made under a sense of impending death. The deceased was shot through the head about eleven o'clock on the evening of the ninth of November, 1892, while in bed, from the effects of which he died about three o'clock on the second day thereafter. It appears from the testimony of Frank Olinger, a boy about eleven years old, who was the only eye-witness to the homicide, that soon after the shooting the deceased got out of bed and tried to build a fire. Then he attempted to wash the blood from his person and close the door, but went back to bed, saying he "was shot through the head, and did not think he would live because he was hurt too bad." When visited by the physicians on the afternoon of the following day, he was found in a semi-comatose but conscious condition, capable, when aroused or spoken to, of answering intelligently such questions as were propounded to him. The witness Martin testifies that he called at the residence of the deceased about four o'clock on the day following the shooting, just as the physicians were leaving, and remained about two hours. At intervals during the time he was there the deceased used the expression, "My God, I can't live!" and after he had used this expression several times the witness says: "I went back to the bed where he was lying and spoke to him, and took him by the hand, and said: 'Charley, do you know me?' and he hocked the blood out

of his mouth and said: 'Mr. Martin.' I said, 'Charley, this is a horrid, bloody affair.' I said: 'Who did it,' and he said 'Frank Fletcher.' He said that just one time. He seemed to be suffering greatly, and I thought he would rally, and I would have a further conversation with him. I thought it was not right to talk with him." Statements as to the person who committed the crime, similar to those made to the witness Martin, were also made by the deceased to the attending physicians and the deputy sheriff a short time before Martin called, and to one Irons, about nine o'clock of the same evening, and while he was in about the same physical condition. Under these circumstances we think the declarations were competent evidence. Here was a man lying on his bed in a semi-comatose condition, suffering from a mortal gunshot wound, from which he never rallied, and which speedily proved fatal, and declaring at intervals that he could not live. Not a word seems to have been said by the physicians, the deceased, or any one else, indicating that there was the slightest hope of his recovery, or that he had in any way changed his opinion as to the result of the wound, as expressed to the boy Olinger on the evening before. When we consider these circumstances, and his physical condition, of which he was manifestly conscious, we cannot doubt that he was under a sense of impending death at the time the declarations admitted in evidence were made. To render the declarations of a deceased person evidence, it must appear that they were made under a sense of impending death, and when the deceased had no hope of recovery; but it is not necessary to prove the existence of such belief by any express statements of the deceased, but it may be inferred from all the circumstances. "It is enough," says Mr. Greenleaf, "if it satisfactorily appear in any mode that they were made under that sanction; whether it be directly proven by the express language of the declarant or be inferred from his

evident danger, or the opinion of the medical or other attendants stated to him, or from his conduct or other circumstances of the case, all of which are resorted to in order to ascertain the state of the declarant's mind": 1 Greenleaf, Evidence, § 158; Kerr, Homicide, § 412; *People* v. *Simpson*, 48 Mich. 474; *Fitzgerald* v. *State*, 11 Neb. 577; *State* v. *Johnson*, 9 Criminal Law Magazine, and note.

2. The witness Olinger, who at the same time was shot in the neck and hand, remained alone all night with the deceased, and in the morning started to his own home about a mile and a quarter distant, but returned because, as he testified, he was afraid that two persons whom he saw going from the barn along the fence, but did not recognize, would kill him. An attempt was made by the defendant to impeach this witness by showing that he had stated to one Jessie McKinney, or in his presence, that one of the men he saw coming from the barn on the morning after the shooting, was the defendant, but on an objection by the state, the evidence was rejected. The object of this proposed evidence was to impeach the witness by showing that he had made statements out of court inconsistent with his testimony, but, if the court below was in error in supposing that a proper foundation had not been laid for its admission, the exclusion of the evidence was harmless error because the witness admitted on the stand that he had so stated to different persons. When we remember that he claims to have recognized the defendant at the time of the shooting, as one of the persons who so foully attempted to murder him, it is not surprising that on the following morning, alone in the mountains, a mile and a quarter from home, and suffering from his wounds, the boy should have thought or imagined that one of the persons he saw coming from the barn, as he supposed, was the defendant.

3. The next assignment of error is in the refusal of the court to permit the defense to use the pistol and cart-

ridges found on the person of the defendant at the time
of his arrest, and admitted in evidence, for the purpose of
testing the shooting capacity of the pistol by shooting into
a section of a log taken from the cabin in which the
deceased was shot, for the purpose of showing that a ball
from this pistol would penetrate much further into the
wood than the evidence showed was done by the pistol
that probably did the killing.  The evidence tends to
show that about eleven o'clock on the night of the shoot-
ing, after the deceased and the boy Olinger had gone to
bed, two persons came to the house and knocked on the
door, when the deceased told them to come in, which they
did by bursting the door and said: "Money or your
brains!"  The deceased told them he had no money,
whereupon they demand jewelry, and this being refused,
they commenced firing, and fired about ten or twelve shots
in all, some taking effect in the wall of the house.  It was
not shown from what points or position in the room any
of the balls embedded in the wall were fired, or that the
cartridges were the same as those in evidence, or that the
distance from which the shots were fired was known, or
that any of the conditions under which it was proposed to
experiment with the pistol, existed at the time the shots
were fired into the wall.  Without such a showing it is
manifest there was no error in the ruling of the court.
Experiments of this nature, to furnish data for certain
inferences, must be based as nearly as possible upon con-
ditions and circumstances like those existing in the case
on trial, otherwise the tendency is to mislead and confuse
the jury:  *State* v. *Justus*, 11 Or. 179; *Commonwealth* v.
*Piper*, 120 Mass. 185.  It was not shown in this case that
there was any similarity in the conditions under which it
was proposed to make the experiment and those existing
at the time the shots were fired into the wall, and hence
there was no error in the ruling of the court.

4.  The next assignment of error is in the refusal of

the court to allow the defendant to prove by A. J. Dennis-ton, Henry James, Edw. Brown, and other witnesses, that the said A. J. Denniston has a son by the name of Walter, about twenty years of age, light complexion, and about the same stature of the defendant, who, in the month of November prior to the murder, threatened to kill the deceased because of some trouble with his father, and that on the morning of the tenth of November, between the hours of three and four o'clock, Walter, accompanied by another person of about his own age, came down from off the mountain, from the direction of Fletcher's mill, stopped at the warm springs about five miles from deceased's cabin, and called his father out of bed, and told him that he had come to see him for the last time, "that he had killed that son of a bitch of a Petre and his kid"; that at this time Walter Denniston had on clothing corresponding with that described by the boy Olinger as having been worn by the defendant at the time of the killing, and that immediately after making this statement to his father, Walter and his companion left the warm springs, and his present whereabouts is unknown. This testimony was, we think, clearly inadmissible. There was no evidence what-ever tending to connect Walter Denniston with the com-mission of the crime, excepting his own admission and his previous threats, and that he was seen five miles from the place of the homicide four or five hours after it was committed, coming from the direction of Fletcher's mill, wearing clothing corresponding with that worn by one of the guilty parties as described by the boy Olinger. Such evidence affords no reasonable presumption or inference as to the guilt or innocence of the defendant, and is *res inter alios acta,* and the merest hearsay.

In *Greenfield* v. *People,* 85 N. Y. 76, the defendant, under an indictment for murder, and against whom the evidence was only circumstantial, offered in evidence a letter written by one Royal Kellogg to his brother, which,

among other things, contained the following language: "Tell me all about the murder. If you think it all right, tell them I am in Lafayette, and if they want me they can come and get me." And in connection with this letter also offered the testimony of a witness to show the declarations of Kellogg and his brother and another person, made a short time after the murder at a place about three fourths of a mile distant. The witness was awakened by the barking of a dog about four o'clock in the morning, and, on looking out of the window, he recognized the two Kelloggs and one Taplin, who had a double-barreled gun and a bag with something in it. After testifying to the suspicious conduct of the parties, the prisoner's counsel offered to prove by the witness that Taplin said to the Kelloggs, "You were damned fools to do it," and one of the Kelloggs replied, "If we had not done it we should all have been hung." It was held this evidence was properly excluded, MILLER, J., saying: "Even if this letter could be regarded as a confession of Kellogg that he committed the murder, it was only the declaration of a third party, merely hearsay testimony, and upon no rule of evidence admissible. If such declarations were competent upon any trial for homicide, they would tend clearly to confuse the jury and to divert their attention from the real issue. The letter did not tend to establish that Kellogg committed the offense — was not part of the *res gestæ*, and in no sense relieved the prisoner from the charge for which he was upon trial, or raised any presumption that Kellogg was the guilty party. Confessions of this character are sometimes made to screen offenders, and no rule is better established than that extra-judicial statements of third persons are inadmissible. * * * While evidence tending to show that another party might have committed the crime would be admissible, before such testimony can be received there must be such proof of connection with it, such a train of facts or circumstances as tend clearly to

point out some one besides the prisoner as the guilty party. Remote acts, disconnected and outside of the crime itself, cannot be separately proved for such a purpose. In considering the question, we have carefully examined the numerous authorities cited to sustain the position that the evidence was competent, and none of them hold that under such circumstances it could lawfully be received, and it was neither admissible alone or in connection with the letters referred to." In *West* v. *State*, 76 Ala. 98, it was held that the admission or confession of another person, made on his deathbed, that he committed the crime, is mere hearsay, and not admissible as evidence in the case.

In *Walker* v. *State*, 6 Tex. App. 576, on an indictment for murder, it was held incompetent for the accused to prove that a very short time before the homicide a person other than the accused made threats to take the life of the deceased, the court saying: "The issue on the trial was the guilt or innocence of the defendant on trial. Evidence is admissible if it tends to prove the issue, or constitutes a link in the chain of proof; and this seems to be the limit, and excludes all evidence of collateral facts, or those which are incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute; and for the good reason stated for the rule by Mr. Greenleaf, that such evidence tends to draw away the minds of the jury from the point in issue, and to excite prejudice, and mislead them: 1 Greenleaf, Evidence, §§ 51, 52." So in the case of *State* v. *Davis*, 77 N. C. 483, which was also an indictment for murder, the prisoner proposed to prove by one Peck "that George Nicks had malice toward the deceased, and had a motive to take his life, and opportunity to do so, and had threatened to do so before the court." He further offered to prove by one Rice, "that one Peck took a gun, and went in the direction of the house of the deceased with the threat that he was going to kill the deceased some time before the deceased was killed."

This evidence was held incompetent, the court saying: "Both exceptions are untenable, and have been repeatedly so held by this court; the first, because they are declarations of a third party, and are *res inter alios acta*, and have no legal tendency to establish the innocence of the prisoner, and the second for the same and the additional reason that the time is too vaguely and indefinitely set forth. * * * Such evidence is inadmissible because it does not tend to establish the *corpus delicti*. Unquestionably it would have been competent to prove that a third party killed the deceased, and not the prisoner. But this could only have been done by proof connecting Peck with the fact—that is, with the perpetration of some deed entering into the crime itself. Direct evidence connecting Peck with the *corpus delicti* would have been admissible. After proof of the *res gestae* constituting Peck's alleged guilt had been given, it might be that the evidence which was offered and excluded in this case would have been competent in confirmation of the direct testimony connecting him with the fact of killing. No such direct testimony was offered here. It is unnecessary to elaborate, as the questions of evidence here made have been fully discussed and decided by this court in many cases." Indeed, there seems to be an absolute unanimity in the decisions in holding that it is going far enough in favor of the accused to allow him to exculpate himself by showing the fact of another's guilt by some appropriate evidence directly connecting that person with the *corpus delicti*, and in criminal cases mere evidence of confession of guilt by a third person, or of threats made by such person against deceased, is clearly inadmissible: Bishop, Criminal Procedure, § 623; Wharton, Criminal Evidence, § 225; Wharton, Homicide, § 693; 4 Am. & Eng. Enc. 866, and authorities cited; *State* v. *Beaudet*, 53 Conn. 536; *Woolfolk* v. *State*, 81 Ga. 551; S. C. 85 Ga. 69; *State* v. *Bishop*, 73 N. C. 44; *Rhea* v. *State*, 18 Tenn. 256.

The other assignments of error in the record have been carefully examined and considered and we find no error therein.   The judgment of the court below will therefore be AFFIRMED.