Argued May 6, decided June 30, 1908.

## STATE v. FULLER.

[ 96 Pac. 456.]

HOMICIDE—DYING DECLARATIONS—ADMISSIBILITY.

1. The dying declarations of a woman on whom an abortion has been performed, are not admissible where her death is not an essential ingredient of the offense which is complete without it; but where her death is, by statute, an indispensable element of the crime charged, her dying declarations are admissible.

SAME—EVIDENCE WHEN COMPETENT.

2. Under Section 1748, B. & C. Comp., providing that a person administering to a pregnant woman any drug or using any instrument with intent to destroy the child, shall, in case of the death of the woman, be deemed guilty of manslaughter, etc., the dying declarations of a deceased pregnant woman, dying as a result of a criminal operation performed by another, are, so far as they explain the circumstances attending the injury causing death, competent.

SAME—DYING DECLARATIONS.

3. Under Section 718, B. & C. Comp., providing that in criminal actions, the declarations of a dying person made under a sense of impending death, respecting the cause of death, shall be admissible, etc., the dying declarations of a person when made *in extremis*, under a solemn sense of impending dissolution, and without any hope of recovery, are admissible in a criminal

action relating to the injury of which he subsequently died, when his death is the subject of the charge, and the circumstances of the death are the subject of the declarations.

SAME—WEIGHT OF DYING DECLARATIONS.

4. The competency of dying declarations is for the court, and, where the declarations are admitted in evidence, they receive only such weight as the jury may determine.

SAME—DECLARATIONS AS EVIDENCE OF.

5. Where it appears to the satisfaction of the trial court that a declarant was conscious of his impending death, and did not entertain an expectation of recovery, the admission of his declarations as dying declarations will not be reviewed, except in cases of an abuse of discretion.

SAME.

6. A *prima facie* case is sufficient to authorize a submission of dying declarations to the jury.

SAME.

7. The mental state of declarant on the issue of the admissibility of his declarations, as dying declarations, need not be established by express words, but may be inferred from the attending circumstances

SAME.

8. On a trial for manslaughter, decedent, on the day preceding her death, said to her father that she could not get well, and that her attending physician had told her so. At that time decedent's color was yellow, her breath short, her pulsation weak, and her eyes glassy. *Held,* that the court, in admitting her declarations made at that time as dying declarations, did not abuse its discretion.

SAME—QUESTION FOR THE JURY.

9. Whether at the time decedent made declarations, received in evidence as dying declarations, cherished a hope of restoration to health is a question for the jury.

SAME.

10. The recitals in dying declarations, which are admissible in evidence, include recitals of fact which might have been given by declarant if living and appearing as a witness at the trial, and may include statements of facts occurring or existing coincident with the commission of the homicide, and tending to establish every essential element of the crime.

SAME.

11. Under Section 1748, B. & C. Comp., providing that any person administering to any pregnant woman any medicine or using any instrument with intent to destroy a child, unless the same shall be necessary to preserve the life of the woman, shall, in case of her death, be guilty of manslaughter, the dying declarations of a woman on whom an abortion has been performed, tending to show that the means employed by accused to procure a miscarriage were unnecessary to preserve decedent's life, are admissible since it is incumbent on the prosecution to prove such fact.

SAME—IMPEACHMENT.

12. Section 853, B. & C. Comp., prescribing the manner of laying foundation for the impeachment of a witness by proof of statements inconsistent with his testimony on laying a foundation therefor, does not apply to dying declarations, for no opportunity is offered accused to interrogate decedent.

SAME—DYING DECLARATIONS—IMPEACHMENT.

13. Dying declarations may be impeached by contradictory statements made by decedent in respect to the party accused of the killing, and in relation to the cause and circumstances of the homicide.

SAME.

14. On a trial for manslaughter by a criminal abortion, the prosecution showed decedent's dying declarations to the effect that she was well and doing her work until accused first visited her professionally. Accused sought to show that when he visited decedent he found her suffering from an incomplete miscarriage, that her physical condition necessitated a removal of the fetus, and that in the performance of the operation he was assisted by another physician. *Held*, that it was reversible error to exclude the testimony of a witness that decedent, about twenty days before accused visited her, told the witness that she was in the "family way," and specified the acts done by her to produce a premature delivery, though the witness testified that decedent appeared well at that time.

CRIMINAL LAW—INSTRUCTIONS—TESTIMONY OF ACCUSED.

15. An instruction that the jury are not required to believe the testimony of the accused testifying as a witness in his own behalf, but that they may consider whether it is true and made in good faith, or only for the purpose of avoiding a conviction. is erroneous.

From Baker: WILLIAM SMITH, Judge.

The defendant, Roy Fuller, was convicted of the crime of manslaughter, and from the judgment and sentence which followed, he appeals. REVERSED.

For appellant there was a brief over the names of *Charles F. Hyde, William H. Strayer, Charles E. Cochrane, John L. Rand* and *Vernor W. Tomlinson,* with oral arguments by *Mr. Cochrane* and *Mr. Tomlinson.*

For the State there was a brief over the names of *Andrew M. Crawford,* Attorney General, *Leroy Lomax,* District Attorney, and *Gustav Anderson,* Deputy District Attorney, with oral arguments by *Mr. Crawford* and *Mr. Lomax.*

MR. JUSTICE MOORE delivered the opinion of the court.

The defendant, Roy Fuller, and two other persons were jointly charged by an information with the crime of manslaughter, alleged to have been committed in Baker County, September 24, 1906, by unlawfully administering to one Abbie Gover, who was then *enceinte,* noxious drugs, and of using instruments upon her with

intent to destroy the child with which she was pregnant, and that to preserve the life of Abbie Gover it was unnecessary to use such means, but that by the employment thereof she died October 8, 1906. The defendant was separately tried, and, having been convicted as charged, he appeals, assigning numerous alleged errors, only two of which will be considered.

As a preliminary matter, it becomes necessary to determine whether or not a sufficient foundation was laid for the introduction in evidence of Mrs. Gover's dying declarations. Her father, M. Maley, testified that on the day preceding her death she said to him that she "couldn't get well," and that her attending physician had told her so. After describing his daughter's emaciated condition, and saying that her color was yellow, her breathing short, her pulsation weak, and her eyes glassy, he was permitted, over objection and exception, to detail what she then said to him, relating to the cause and circumstances of her illness, which narration tends to incriminate the defendant. It is argued by defendant's counsel that Mrs. Gover's acknowledgment that she "couldn't get well" does not signify that she believed death would be immediate, but only that she thought her health would remain impaired, though she might live many years; and the predicate being inadequate, her declarations were inadmissible.

1. The dying declarations of a woman, upon whom an abortion had been performed, were not originally admissible, on the ground that her death was not an essential ingredient of the offense which was complete without it; but when her demise, as a result of a premature delivery produced by another person, is made by statute an indispensable constituent of the crime as charged, her dying declarations are receivable in evidence: Elliott, Evidence, § 2770; Greenleaf, Evidence, § 156; Wigmore, Evidence, § 1432; *State* v. *Meyer*,

65 N. J. Law, 237 (47 Atl. 486: 86 Am. St. Rep. 634) ; *State* v. *Johnson,* 26 S. C. 152 (1 S. E. 510) ; *Worthington* v. *State,* 92 Md. 222 (48 Atl. 355: 56 L. R. A. 353: 84 Am. St. Rep. 506).

2. Our statute, specifying the acts constituting the crime of which the defendant was convicted, is as follows:

"If any person shall administer to any woman pregnant with a child, any medicine, drug, or substance whatever, or shall use or employ any instrument or other means, with intent thereby to destroy such child, unless the same shall be necessary to preserve the life of such mother, such person shall, in case the death of such child or mother be thereby produced, be deemed guilty of manslaughter": B. & C. Comp. § 1748.

3. Mrs. Gover's explanation of the circumstances attending the injury which, it is alleged, caused her death is competent, and, as she possessed mental capacity, it remains to be seen whether or not she was, at the time specified, so conscious of her physical condition as to render her declarations admissible in evidence. In the absence of a formal oath, out of court, usually surrounded by friends, and not confronted by the party accused of the commission of the homicide, nor subjected to cross-examination, the dying declarations of a person, when made *in extremis,* under a solemn sense of impending dissolution, and without any hope of recovery, are receivable in evidence in a criminal action, relating to the injury of which the victim afterwards dies, when the death of the declarant is the subject of the charge, and the circumstances of the death are the subject of the declarations: B. & C. Comp., Sec. 718; *State* v. *Garrand,* 5 Or. 216; *State* v. *Saunders,* 14 Or. 300 (12 Pac. 441) ; *State* v. *Shaffer,* 23 Or. 555 (32 Pac. 545).

4. The competency of dying declarations is a question to be decided by the court, and if they are admitted in evidence they are to receive only such weight and credi-

bility as the jury may determine: *State* v. *Foot You,*
24 Or. 61 (32 Pac. 1031, 33 Pac. 537).

5. If it appears to the satisfaction of the court that
a declarant was conscious of his immediate death, and
did not entertain an expectation of recovery, the admis-
sion of his declarations ought not to be reviewed, except
in cases of an abuse of discretion: *State* v. *Ah Lee,*
7 Or. 237; *State* v. *Saunders* 14 Or. 300 (12 Pac. 441);
*State* v. *Doris,* 51 Or. 136 (94 Pac. 44).

6. The rule ·is that a *prima facie* case is all that is
required to authorize a submission of dying declarations
to the jury: *Anderson* v. *State,* 122 Ga. 161 (50 S. E. 46).

7. The mental state of the declarant, in respect to
the belief entertained and the hope cherished, need not
be established by express words, but may be inferred
from the attending circumstances: *State* v. *Fletcher,*
24 Or. 295 (33 Pac. 575); *State* v. *Gray,* 43 Or. 446
(74 Pac. 927); *State* v. *Thompson,* 49 Or. 46 (88 Pac.
583).

8. The defendant's counsel, in support of the prin-
ciple which they assert, cite, *inter alia,* the case of *Starr*
v. *Commonwealth,* 97 Ky. 193, 196 (30 S. W. 397, 398),
where the declarant said: "He would not get well," and
"He could not stand it much longer"; and it was held
that no predicate had been established for the admission
of the declaration, the court saying:

"It does not appear that the deceased had been told
that he could not recover, and he had lived for nearly
seven months after being shot. The language seems to
us rather that of discouragement than of a conviction
of impending death."

The case thus relied upon is not identical with the
facts herein, for Mrs. Gover's attending physician, who
was present when she uttered her dying declarations,
referring to an inquiry then made by her, testified as
follows:

"At that time she asked me whether she could get well, and I told her that it would be impossible; that her chances would be very doubtful."

In *Gipe* v. *State,* 165 Ind. 433 (75 N. E. 881: 1 L. R. A. (N. S.) 419: 112 Am. St. Rep. 238), the declarant, though advised by her physician that he thought she would recover, expressed to him the belief that she would not get well; and it was held that her declarations were made under a sense of impending death, without hope of recovery.

In the case at bar the court might reasonably have inferred from the narration of Mrs. Gover's expression that she could not get well; that she intended thereby to convey to her father the idea that she expected immediate death, as a result of the injury which, it is asserted, soon thereafter proved fatal; and, this being so, it cannot be said that the admission in evidence of her dying declarations was an abuse of discretion.

9. Whether or not she cherished a hope of restoration to health, from the physician's advice that her chances would be very doubtful, was a question properly submitted to the jury: *State* v. *Doris,* 51 Or. 136 (94 Pac. 44).

10. Mrs. Gover's father was permitted, over objection and exception, further to testify in relation to her dying declarations as follows:

Q. "Mr. Maley, state whether or not she said anything then as to her condition at the time Dr. Fuller came there on Sunday night? Did you ask her about that?

A. Yes, she said she was well all that day and doing her work up until the time Fuller came there.

Q. Go right ahead, and state what she said in that connection.

A. She went on and told what—

Q. I mean anything further about her condition—whether she was suffering before he came?

A. I asked her if she had any pain, any indication that there was a miscarriage, and she said that she did not; that she was well all day, and doing her work."

It is insisted by defendant's counsel, that the affirmations thus narrated do not refer to any of the circumstances attending Mrs. Gover's death, thereby disclosing that her declarations, in the particulars last specified, were inadmissible. The importance of this testimony is apparent. If it was receivable in evidence, it tended to show that the removal of the *fetus* was not necessary to preserve Mrs. Gover's life, the maintenance of which will alone justify the use of the means alleged to have been employed by the defendant: B. & C. Comp. § 1748. In deciding what recitals are admissible, as dying declarations, courts have frequently held that the test of competency is to be determined by considering whether the declarant, if living, would have been permitted at the trial of the party accused of feloniously injuring him, to testify to the statements contained in such declarations. The doctrine so asserted is undoubtedly broader than warranted, though it was probably appropriate in the several cases in which it was applied. The legal principle thus announced is not universally fitting, for many material matters might arise at the trial of a criminal action in which the victim of a felonious injury, if living, could have testified, but whose dying declarations relating to the same matters would be clearly inadmissible. Thus he might testify that the reputation of a witness for truth and veracity in the neighborhood where he resided, was bad—an issue of fact which might become material, but would not be competent as a dying declaration. Many other instances might be given, but the one noted will suffice to illustrate the principle sought to be elucidated. What the courts evidently mean by the frequently repeated statement, that dying declarations must relate to only such facts as the decla-

rant would have been permitted to narrate as a witness, if he could have appeared as such at the trial of his assailant upon a charge of feloniously injuring him with intent to kill, is that the declarations must be limited to a recital of the circumstances constituting the *res gestae* of the homicide. In discussing this subject a text-writer says: "The decedent's statements must be confined to what actually transpired at the time and place of the killing, who were the actors, when and where it occurred, the position of the persons, what was said by the parties, the instruments used, and how the homicide was committed": 4 Ency. Evidence, 1000. We believe that exigency demands an expansion of the rule beyond what appear to be the limits thus prescribed, so as to include in the dying declarations, as testimony which might have been given by the declarant, if living and appearing as a witness at the trial, statements of other facts, occurring or existing coincident with the commission of the homicide, and tending to establish every essential element of the crime as charged. Thus, in *Lister* v. *State,* 1 Tex. App. 739, 743, a declarant gave his name which was unknown to all the witnesses, and it was determined that the dying declarations of the person killed were competent to prove his name as laid in the indictment, the court saying:

"We can see no reason why this fact, contained in his dying declarations and as part thereof, and tending, as it did, expressly and positively to prove the *corpus delicti* as charged, was not competent and admissible as any other fact therein stated."

11. It was incumbent upon the state to prove, beyond a reasonable doubt, every material averment of the charge, one constituent of which is that the administration of noxious drugs to Mrs. Gover, or the using upon her of instruments, with intent to destroy the child with which she was pregnant, was not necessary to preserve

her life: B. & C. Comp. § 1748. To exclude that part of the dying declarations of a pregnant woman, that tend to prove that the means employed by another person to procure her miscarriage were unnecessary to preserve her life, might render convictions in such cases impossible; and in view of the consequences thus assumed, we believe necessity demands that her declarations, tending to establish such constituent of the accusation, are competent.

12. It is deemed proper to state that the transcript shows that the defendant is a graduate of a reputable medical college, and his theory of the case is that Mrs. Gover, who was married and living with her husband, was on September 24, 1906, suffering from an incomplete miscarriage, which physical condition necessitated a removal of the *fetus*, and that in the performance of such operation he was assisted by another physician. For the purpose of laying a foundation upon which to erect the hypothesis mentioned, the defendant's counsel called as their witness Mrs. W. Saunders, who having testified that on September 2, 1906, she last saw Mrs. Gover, who spoke of her physical condition, was directed as follows: "You may state to the jury what that conversation was." An objection to this command having been interposed, the defendant's counsel stated that if the witness was permitted to answer the inquiry, she would testify that Mrs. Gover, at the time mentioned, informed her that she was in the "family way," and told her what she had done, particularly specifying the acts, to produce a premature delivery; that by expert witnesses they would prove that the means so employed might have produced an incomplete miscarriage, thereby necessitating an evacuation of the uterus; that by other witnesses they would show that Mrs. Gover was suffering from a dead *fetus* September 23, 1906, when the defendant visited her; that for the purpose of connecting the testimony, other wit-

nesses would state upon oath that Mrs. Gover men-
struated in June, 1906, and not again until about Sep-
tember 8 of that year; that soon thereafter she was
frequently obliged to lie on a lounge, and also com-
plained of pain in her abdomen; that on September 23,
1906, she called a physician, who, upon examination,
found her temperature to be 100 2-5 degrees, her pulsa-
tions more than 100 a minute, her tongue coated, her
breath fetid, and her uterus emitting a maladorous dis-
charge, in which region she complained of distress; and
that by medical experts the defendant's counsel would
show that Mrs. Gover's cessation of catamenial fluxes in
July and August, 1906, indicated that she was gravid,
and that her discharge of vital fluid in September of
that year evidenced the death of a *fetus* which had per-
ished prior to the 23d of that month. The court rejected
the offer of proof as made, but permitted the witness to
state what the deceased had said to her with regard to
her health and physical condition only, and exceptions
were reserved. Mrs. Saunders replied: "She told me
the condition she was in. She seemed to be
perfectly well in that condition, but of course
there is no woman that can be perfectly well
in that condition—she could not be in perfect
health." The district attorney thereupon inquired:
"State just what she said as to how she felt." An
objection to the witness giving a part of the conversa-
tion, unless she was permitted to detail the entire col-
loquy, having been overruled, and an exception allowed,
Mrs. Saunders answered: "She did not say how she was
feeling." The defendant's counsel thereupon submitted
in writing their offer of proof, in substance as herein-
before set forth, but the proposal was denied, and an
exception allowed. It is argued that the defendant had
the right to impeach that part of Mrs. Gover's alleged
dying declarations that had been received in evidence

over objection and exception, wherein her father stated that she told him she was well and doing her work until the defendant arrived, and that in denying the exercise of such right an error was committed. Our statute prescribes the manner of laying a foundation to discredit the testimony of a witness: B. & C. Comp. § 853. The rule thus instituted can have no application to dying declarations, for no opportunity is afforded the party accused of the commission of a homicide to interrogate the deceased in respect to such controversial narrations: *Felder v. State,* 23 Tex. App. 477 (5 S. W. 145: 59 Am. Rep. 777).

13. That dying declarations may be impeached by contradictory statements made by the deceased in respect to the party accused of the killing, and also in relation to the cause and circumstances of the homicide, is settled beyond controversy: 1 Bishop, N. Cr. Proc. § 1209; Gillette Ind. & Col. Evidence, § 204; 10 Am. & Eng. Enc. Law (2 ed.), 384; *State v. Shaffer,* 23 Or. 555 (32 Pac. 545); *Nelms v. State,* 13 Smedes & M. (Miss.) 500 (53 Am. Dec. 94); *People v. Lawrence,* 21 Cal. 368; *Green v. State,* 154 Ind. 655 (57 N. E. 637); *Carver v. United States,* 164 U. S. 694 (17 Sup. Ct. 228: 41 L. Ed. 602).

14. Mrs. Gover's dying declarations, relating to her health and physical condition September 23, 1906, when the defendant first visited her professionally, as detailed by her father, were subject to impeachment. It will be remembered that Mrs. Saunders testified that Mrs. Gover appeared perfectly well September 2, 1906, and, though health is a relative term, it is possible that in the three weeks subsequent to the time last mentioned the deceased may have become quite ill. The means imputed to have been employed by Mrs. Gover to produce a miscarriage were factors which might possibly have impaired her health, and, in refusing to receive the proof offered, the defendant was denied a substantial right to his prejudice.

15. The defendant having appeared as a witness in his own behalf, the court in its charge, referring thereto, said to the jury: "You are not required to believe the testimony of said accused is true, but you are to consider whether it is true, and made in good faith, or only for the purpose of avoiding conviction." An exception having been taken to this instruction, we are compelled to hold that an error was. committed in giving it: *State* v. *Pomeroy*, 30 Or. 16 (46 Pac. 797; *State* v. *Bartlett*, 50 Or. 440 (93 Pac. 243).

For the reasons here given the judgment is reversed, and the cause remanded for a new trial.

REVERSED.