Argued September 10; reversed November 13, 1941

MERCEP *v.* STATE INDUSTRIAL ACCIDENT
COMMISSION
(118 P. (2d) 1061)

Before KELLY, Chief Justice, and BAILEY, LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

*Oliver Crowther*, Assistant Attorney General (I. H. Van Winkle, Attorney General, and C. S. Emmons, Assistant Attorney General, on the brief), for appellant.

*Victor R. Griggs*, of Portland (Gunther F. Krause, of Portland, on the brief), for respondent.

LUSK, J. This appeal is prosecuted by the defendant, State Industrial Accident Commission, from a judgment in favor of the plaintiff, Matilda Mercep, based on the verdict of a jury awarding the plaintiff compensation on account of the death of her husband, Matt Mercep.

The defendant assigns error in the admission into evidence of certain statements made by the deceased

a short time before his death. They were admitted as dying declarations. The defendant contended in the court below, and contends here, that the evidence was hearsay. The question was raised on the trial by objections to the evidence, motion to strike the testimony from the record, and motion for a directed verdict.

Mercep died on July 4, 1939. The alleged dying declarations were made while he was sick in a hospital in Hillsboro following an operation for hernia. Two or three days before his death he made the following statement to a friend, John Sarabacha:

"He cleaned up a place for cutting for falling timber, that is all he said. There was a limb on the way and he picked that limb and threw it to one side; he says he stepped, when he grabbed that limb, and he stepped on a windfall and his foot slipped; as quick as his foot slipped and threw the limb, just like a pain, pain him right in his stomach."

He told his wife while in the hospital:

"He clean out brush and lift a chunk and slipped to the side, he got the pain."

The precise date of this statement is not shown. Mrs. Mercep saw her husband four times while he was in the hospital, the first time on June 21, the last on June 29. It was on one of these occasions that the statement was made.

Apart from one contention of the defendant, which we find it unnecessary to pass upon, it was a legitimate deduction from this evidence and other facts disclosed that the accident described, which arose out of and in the course of Mercep's employment, was the proximate cause of hernia and subsequently of his death. On the other hand, plaintiff concedes that without the statements in question there is no proof of accidental injury and her case fails.

Decision of the question requires examination of the whole of the testimony.

Matt Mercep was a logger employed by Alder Creek Lumber Co. in Washington county. Prior to June 7, 1939, he had no disability. On that day he complained to a fellow worker of pain in the lower right side. On June 9 he consulted a physician to whom he made the same complaint. On June 19 he was admitted to Jones hospital in Hillsboro, and the next day was operated on for hernia. He ran a fairly normal course until about the eleventh day after the operation when he developed a thrombophlebitis in the iliac vein on the left side, which caused severe pain. On July 4 he left the hospital against the advice of the attending physician and the manager of the hospital, having first signed a writing relieving them of responsibility for his act. He was taken to his home, a distance of about nine miles, in an automobile. As he entered the house he collapsed, and ten minutes later died. The undisputed immediate cause of death was a blood clot or clots which lodged in the pulmonary artery and blocked the circulation of the lungs. It is explained in the medical testimony that a thrombus is a clot of blood which forms in a vessel during life, while an embolus is that same clot of blood, or a portion of it, which becomes detached and is carried through the circulatory system to some point where its caliber or diameter is greater than the vessel in which it finds itself and where it lodges. If that is a vital spot death ensues. The cause of death in this case is known as pulmonary embolism.

The medical testimony is further agreed that the embolism which caused death had its origin in the thrombus or blood clot which had formed before death

in the decedent's iliac veins, the region in which phlebitis or inflammation of the veins had developed.

There is no testimony that thrombus, located as this one was, could in and of itself cause death. It has in it the potentialities of death on account of the danger that it may break loose and start on its journey through the blood stream.

Dr. Warren C. Hunter, a pathologist who performed the autopsy, was of the opinion that Mercep's getting up was "a most potent factor in the cause of death". As to whether pulmonary emboli would have resulted had he remained in bed, he said that he did not know.

Dr. Louis K. Poyntz, who assisted at the autopsy as the representative of the plaintiff, conceded that where a man has thrombosis the medical profession recognizes that rest is the cure since there is danger that activity may cause the blood clot to become detached. He also conceded that the thrombus usually absorbs if the patient remains quietly in bed. But he insisted that in this case the clot probably would have broken loose whether Mercep remained in bed or not, explaining that the microscopic examination showed that the clot had softened and that no one could say whether embolism was caused by movement or by the softening process. He thought that a purely speculative question. Dr. Hunter testified that the thrombus had developed before the patient left the hospital, and it was his opinion that the "whole process (i. e., of the embolism) may have occurred in a few minutes time or it could have been a few hours". Dr. Poyntz testified that there is no way of telling how long it would take the clot to work its way through the vessels and through the blood stream to the pulmonary artery where it lodged.

The medical testimony is further in agreement that enforced rest following the operation for hernia was the probable cause of the thrombus.

Mercep's attending physician was Dr. Archie Pitman, who performed the operation. It was his testimony that the patient ran a normal course until the eleventh day after the operation, which would be July 1, when phlebitis set in, and that he was at no time in a critical condition while in the hospital save that the phlebitis was a potent source of danger without quiet and rest.

The hospital chart fails to disclose that Mercep was either in a serious or critical condition while in the hospital. There is a record of gas distress for four days following the operation, and of pain in the chest which Dr. Pitman diagnosed as a mild attack of pleurisy. This subsided, and there was no more pain apparently until the patient began to suffer pain in his left leg, caused by phlebitis, on the eleventh hospital day, which was June 30. In the cross-examination of Dr. Pitman it was brought out by counsel for plaintiff that Mercep was emotional and a hard patient to control. He answered the following question on cross-examination in the affirmative:

"And a person of that nature and temperament suffering from these gas pains and the tightening of the bandages might be driven to the point where you might say he was just crazy, isn't that true?

Dr. F. J. Kabbeisman, the physician whom Mercep consulted on June 9, testified as a witness for the defendant that he saw Mercep in the hospital on July 3 and that Mercep complained of pain on the inner side of the left leg and had considerable tenderness over the iliac vein. He diagnosed the ailment as thrombo-

phlebitis, and advised absolute quiet and rest, no exercise or motion. He gave no other testimony respecting the patient's condition.

Mrs. Minnie Jones Coy, the manager of the hospital, testified that Mercep was a nervous man who didn't mind very well but did whatever he wanted to do, and that he insisted upon leaving the hospital and going home because there would be so much noise on the Fourth of July.

Near the beginning of the trial the court, without the presence of the jury, conducted a preliminary inquiry at which evidence was introduced by the plaintiff designed to lay a foundation for receiving evidence of the alleged dying declarations. At this preliminary inquiry six witnesses testified, three of whom were later recalled and repeated their testimony before the jury. The essential portions of the preliminary testimony follow.

Joe Mercep saw the decedent on June 25 and 30. He testified concerning his visit of June 25:

"A When I ask him 'How you feel', he told me he didn't feel so hot. I said 'What is the matter, can't you take it'? He said 'That gas, that thing', he said, 'fill me up: I feel just like I am going to blow up;' he said 'I believe that kill me, that gas'.

"Q Is that all he said to you?

"A That is all; I didn't bother him much, because he wasn't feeling good, so I just quit talking with him, he don't feel so hot."

He visited the decedent on June 30 with three other men when the following occurred:

"Well, I don't have a very long talk with him; I just asked him 'how you feel'. He said 'I don't feel any better'. He said 'I believe I am worse now than the first time you saw him', so another fellow started to talk to him, that is all I talked to him."

Sam Sugura saw Mercep two or three days before his death. He testified:

"A I walked right into his bedside, asked him how he feel, then he tell me, he says, 'I feel awful bad, and I am going to die'. I tried right away to cheer him up, I tell him right back, I says 'That operation don't mean death, that is just the same as operating the death out, I had one of those operations myself, Matt, don't get scared, you ain't going to die'. He kept on saying 'Yes, I am going to die'.

"Q Did he at that time make a statement as to the manner in which he was injured on June 7, 1939?

"A Well, then he was talking to John Sarabacha, I walked away, talking to another patient because he called me to come over to see him."

Peter Simondich was one of those who accompanied Joe Mercep on the visit of June 30. His testimony as to his conversation with Mercep was as follows:

"When I came and shook hands with him, and I says 'Matt, how do you get along'? He says 'Not so good'. I says 'What is the matter'? 'Well,' he says 'it seems to me my day is over, and kind of—you know'. I says 'What is the trouble'? Well, he mentioned something—doctor, like he mentioned that he killed him. I says 'Matt, you know you can get better doctors to went to Portland'. 'Well,' he says 'yes, I should, but' he says 'I was hurt alongside'—on his cheek here— 'this doctor fixed me fine. So he says—this is the first doctor—I show the doctor the rupture, and he says, so he told me this doctor is going to get a report from the state, he is going to operate on me, so he is a friend of mine, coming from California. I said they may come any day. He says 'Please bring him over'. I says 'As soon as I get the chance I will bring him over.' So the rest started to talk to him, that is all there was."

Mary Mercep, wife of Joe Mercep, testified that she saw the decedent on the afternoon of June 30 when the following conversation took place:

"He told me—I says 'How you feel'. He said 'No good, I can't breathe', so I says 'What is the matter'. 'I got too much gas'. Then I asked him,—he says 'No, freeze them before you get operation; then they start to cut and I start to scream, then I start to holler, and they give me gas, and they give me lots of it'; then he opened his shirt to show me, he got a belt all around about two inches wide. He says that he no feel good,— 'I going to die'."

As already stated, Mrs. Matilda Mercep, widow of the decedent, saw her husband four times while he was in the hospital, the first time on June 21, the last on June 29. On the latter occasion, according to her testimony, "he told me the doctor give him a freeze and cut him open, then he started bawling, and he give him gas, he said the gas kill him." She testified that on each occasion when she visted him he said that he expected to die—"He tell everybody he die". On one of these occasions there were three other persons visiting Mercep whom she did not know.

Pete Matiaco saw Mercep four days before he died. He testified:

"He said 'I feel worse, Pete, every day'. 'That may be', I says, 'might be all right after that'. 'No', he said, 'they kill me here, worse every day, don't expect to live'."

He went again to the hospital on the Fourth of July and took Mercep home. He testified:

"All right, Matt says 'I go home before I die; I going to die'. I think it is funny anyway,—'better die here than in the hospital'."

On cross-examination he said that he heard the nurse tell Mercep that he would die if he left the hospital and that Mercep said that he would like to die at home and not in the hospital.

██ In this state evidence may be given in both civil and criminal cases of the declarations of a dying person made under a sense of impending death respecting the cause of his death. 1 O. C. L. A. § 2-228 (4); *McCredie v. Commercial Casualty Insurance Co.*, 142 Or. 229, 20 P. (2d) 232, 91 A. L. R. 557; *McCarty v. Sirianni*, 132 Or. 290, 285 P. 825. Two conditions must exist to render a dying declaration admissible: (1) The declarant must have been *in extremis* and (2) it must have been made in the conscious belief that death was impending and without hope or expectation of recovery. *State v. Gray*, 43 Or. 446, 450, 74 P. 927; 1 Jones on Ev. Civ. Cas. 611, § 332 a. As to the second point, see *State v. Fuller*, 52 Or. 42, 96 P. 456; *State v. Thompson*, 49 Or. 46, 48, 88 P. 583, 124 Am. St. Rep. 1015; *State v. Fletcher*, 24 Or. 295, 33 P. 575; *State v. Shaffer*, 23 Or. 555, 557, 32 P. 545; 5 Wigmore on Ev. (3d ed.) 233, § 1440. We think that neither condition existed at the times that Matt Mercep described the accident which led up to his death.

██ He was not *in extremis*. That is demonstrated both by the evidence of his condition, which has been summarized, and by the total lack of evidence that he was then suffering from a mortal illness. At the time that the trial judge ruled the declarations admissible there was no evidence whatever before the court respecting the nature or gravity of his ailment—nothing, save his own statements and the fact that he was in a hospital, to indicate even that he was sick. The plaintiff, though charged with the duty of laying the founda-

tion for the admission of evidence which otherwise would be inadmissible as hearsay, did not see fit to call to the witness stand Dr. Pitman, the attending physician—surely the best qualified person on the subject of Mercep's condition. When his testimony was finally adduced as a witness for the defendant, it showed that at no time while in the hospital was Mercep a dying man and that his condition was not critical except for the danger that the blood clot in his leg might be dislodged. Nothing in the testimony of the other physicians conflicts with Dr. Pitman's testimony.

Even more eloquent is the absence of evidence. The physical phenomena ordinarily attendant upon approaching dissolution are not here. Neither Mrs. Mercep nor Mercep's friends speak of any. Were death impending the manager of the hospital, the nurses, would know of it. Something would have been recorded on the hospital chart concerning it. There is nothing of the kind from any of these sources.

The cases upon this subject are almost without number. See note, 56 L. R. A. 356-457. It would be useless to analyze precedents because they all vary so in their facts; but it may be observed that a rather extensive investigation has failed to reveal any case in which admissibility was even claimed for dying declarations under circumstances similar to those disclosed by this record. The cases all deal with mortal illnesses and mortal wounds, the very descriptions of which on the printed pages of the reports are pictures of impending death. See, for example, *State v. Fuller*, supra, at 52 Or. 45. The decedent's illness did not take on that character until a few hours, at most, before the end came. Until the blood clot was dislodged there was only a threat of disaster which might have been

averted had Mercep been guided by the advice of his physician and nurse and submitted to the treatment which all the medical testimony agrees was indicated.

■ The second condition for the admissibility of a dying declaration has thus been delineated with his usual felicity of phrase by Mr. Justice Cardozo in *Shepard v. United States*, 290 U. S. 96, 100, 78 L. Ed. 196, 54 S. Ct. 22:

"Fear or even belief that illness will end in death will not avail of itself to make a dying declaration. There must be 'a settled hopeless expectation' (Willes, J. in Reg. v. Peel, 2 F. & F. 21, 22) that death is near at hand, and what is said must have been spoken in the hush of its impending presence * * * The patient must have spoken with the consciousness of a swift and certain doom."

The evidence fails to meet that test. If the repeated statements of Matt Mercep that he was going to die are more than the excited, exaggerated utterances of an unruly, emotional patient, critical of his doctors, suffering pain, yet the circumstances make it manifest that the words were not "spoken in the hush of death's impending presence". A setting which would befit such a solemn moment is wholly lacking. Rather, there is almost an air of casualness. Though, as we are asked to believe, her husband had given up all hope of life and so told her every time she saw him, Mrs. Mercep, in the period from June 21 to June 29, visited him in the hospital but four times, and after June 29 she did not see him again until July 4 when he came home to die. It neither appears that she felt impelled to remain with him, to comfort and solace him while the sands of life were running out, nor that he asked her to do so. See, *People v. Sarzano*, 212 N. Y. 231, 106

N. E. 87, 88, where the court in ruling the declaration inadmissible, said:

"The declarant did not ask for wife, children, friends, or priest, or by word or act indicate that he believed his death certain and imminent."

See, also, *Rex v. Spilsbury*, 7 C. & P. 187.

Pertinent is the following language from *State v. Simon*, 50 Mo. 370, 375, quoted in *State v. Johnson*, 118 Mo. 491, 503, 24 S. W. 229, 40 Am. St. Rep. 405:

"Any person who has been accustomed to attend on those who are injured, or are very ill, knows how common it is for them to say that they will never recover, or that they will die, when there is no good or sufficient reason for the apprehension, and they are not conscious themselves that they are in any real danger. Such expressions are often the result of impatience, restlessness or great suffering. But, at the same time, let the attending physician inform them that there is no hope and that they must die, and they will be perfectly startled."

It is a case where the declarant's conduct, considered in the light of the circumstances, "precludes the idea that his alleged dying declarations were made with a solemn conviction of approaching death." *Tibbs v. Commonwealth*, 138 Ky. 558, 564, 128 S. W. 871, 28 L. R. A. (N. S.) 665. See, 26 Am. Jur. Homicide, 446, § 417. They may well have been the declarations of a man who, as counsel for the plaintiff suggested on the trial, was "driven to the point where he is just crazy", but not of a dying man conscious of "a swift and certain doom".

We do not base our decision on the length of time that elapsed between the declarations and death. Nor have we overlooked the rule that the discretion of

the trial court in passing upon the admissibility of this species of evidence is not lightly to be disturbed. *State v. Doris*, 51 Or. 136, 147, 94 P. 44, 16 L. R. A. (N. S.) 660. But "the hearsay character of dying declarations necessitates the use of care and caution in admitting them in evidence". 26 Am. Jur. Homicide, 426, § 384; *State v. Johnson*, supra; *Smith v. State*, 9 Humph. (Tenn.) 9; *Reg. v. Jenkins*, L. R., 1 C. C. R. 191. The principle on which such evidence is admitted, as stated by Lord Chief Baron Eyre in Woodcock's case, 2 Leach 563, is "that they are declarations made in extremity, when the party is at the point of death, and when every hope of this world is gone; when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth; a situation so solemn, and so awful, is considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a court of justice".

The evidence in this case, which has been examined with the utmost care and the substance of which has been stated, wholly fails, in our opinion, to reveal that "solemn" and "awful" situation which would justify a court in dispensing with the necessity of sworn testimony upon the crucial question for determination.

We think that the evidence objected to was erroneously admitted, and, as there was no other proof of accidental injury, the motion for a directed verdict should have been granted.

The judgment is, therefore, reversed.