Submitted September 1, affirmed October 14, petition for rehearing
denied November 4, appeal to United States Supreme
Court withdrawn November 26, 1959

# STATE OF OREGON *v.* BREWTON
## 344 P. 2d 744

Charles E. Raymond, District Attorney, and Oscar D. Howlett, Deputy District Attorney, Portland, for respondent.

SLOAN, J.

Defendant was convicted of killing another while engaged in the commission or attempt to commit robbery, one of the acts defined as murder in the first degree. ORS 163.101(1). He received a life sentence. At the time this appeal was filed he requested this court to appoint counsel in his behalf. At that time the court examined the record and determined that the issues presented did not require the assistance of counsel. Defendant, in person, has filed a brief which adequately presents his contentions.

The indictment, in substance, charges that defendant and one Eugene F. Taylor on November 14, 1957, in Multnomah county, when engaged in the crime of attempted robbery while armed with a pistol, did shoot and kill William W. McKenzie. It cannot be disputed

that Taylor did engage in an exchange of gun shots with Mr. McKenzie at the latter's small grocery store on S. E. 13th street in Portland at the time and place alleged. Both McKenzie and Taylor died as a result of the fracas. We are primarily called upon to determine if the evidence was sufficient to require submission to the jury to decide if a robbery was being attempted at the time of the shooting and, if so, was the defendant present at that time and place as an accomplice or co-conspirator.

The defendant submits several issues which we will consider in order. His motion for a directed verdict requires an examination of the evidence. The defendant did not testify at the trial nor present any evidence to dispute the testimony of the state's witnesses. It remains to be seen if this evidence and the inferences that could properly be drawn from it required the trial court to submit the ultimate question of the defendant's guilt or innocence to the jury. In his brief the defendant makes many statements of fact and explanation which we cannot consider even though some of them admit the presence of the defendant at the scene of the crime.

The evidence that was admitted without serious objection will be mentioned first. We will then discuss the evidence concerning an alleged dying declaration of the victim and an admission alleged to have been made by the defendant. Both were admitted over objection and are the subjects of assignments of error here. The first mentioned evidence discloses that the victim, Mr. McKenzie, operated a small grocery store in S. E. Portland. About 9:30 in the evening of November 14, 1957, Taylor and another man entered the store. Taylor, at least, was armed. Words were first exchanged between McKenzie and Taylor and then

gunshots. Both men were fatally wounded. McKenzie died in a hospital about an hour after the shooting. Taylor apparently survived for a day or two. Taylor's mother lived not far from the scene of the shooting. She testified that the defendant was in her home for a few minutes about 6 or 6:30 that evening with her son, Eugene. When asked if she had seen the defendant later that evening she answered:

"Well, I went to bed kind of early that night, and he was knocking on the door and woke me, and I got up as quick as I could and went to the door.

"I opened the door, and Frankie [the defendant] was at the door. He told, he says, 'Eugene has been shot.' I says, 'Oh, my, is he dead?' He didn't say yes or no. And, he came through the house and went out the back door. And, I asked him, I says, 'Where is Eugene?' and he says, 'He is out in the car.'

"I went with him, and we went to the car. Eugene was in the back of the car and he seemed to be suffering quite a bit.

"Q And what next did you do, Mrs. Taylor?

"A Well, I don't know exactly what I did. No, I did go back in the house and I called my son and daughter and they both came down. And, by that time, Frankie was gone. I didn't see him anymore."

The evidence otherwise reveals that a police ambulance was summoned by some means and Taylor removed to a hospital in that manner. There is no evidence that Taylor ever disclosed his version of what had occurred.

Defendant was otherwise connected with Taylor. One witness testified that she rented a room to Eugene Taylor and defendant on November 11, 1957. The room was rented and paid for for a week only. Other witnesses swore that they had seen defendant in a store across the street from the McKenzie store earlier in

the evening of November 14, 1957. The state contends this last evidence permits the inference that the defendant was in the immediate area before the shooting. The same evidence also permits the inference that defendant was in the neighborhood to select a victim for the proposed robbery. Another witness testified he had heard the shots in the McKenzie store and then saw two men run from the store.

Within an hour after the events described by Taylor's mother the defendant was seen by two patrolling police officers walking along a street near the area of the shooting. The officers were aware of the shooting at the grocery store. Some actions upon the part of the defendant aroused their suspicion and they stopped him for questioning. The officers then observed a bleeding wound in the left hand or lower arm of defendant and so took him in custody on suspicion. The officers testified that at that time the defendant told them he was hitchhiking from Vancouver, Washington, and shortly before had fallen and cut his hand. He gave a ficticious name. Defendant was taken to a hospital for emergency treatment and then returned to police headquarters where he was detained.

Early the next day defendant was taken to Good Samaritan Hospital in Portland where he was further examined and treated by a physician. The testimony of that physician rather dramatically placed the defendant at the scene of a shooting. The doctor described that he first observed two wounds on the defendant's left arm. One was about an inch and a half above the wrist and the other in the palm of the hand. When he was in the process of washing one of the wounds with salt water solution the liquid "came out this wound showing there was a track between the two wounds. The solution went in one wound and out the other,

which indicated a bullet wound, which probably entered here and came out here and with a track left between the two (indicating throughout)." Thereafter the defendant was confined in jail. Police detectives testified that he shortly confessed his part in the affair to them and described the events leading to the shooting. We will return to this confession.

The evidence thus far related is a summary of the evidence which was admitted without challenge and which was directed primarily at the participation of the defendant in the affray. Other evidence was introduced which established the cause of McKenzie's death, the identification of the weapon which fired the death-provoking shots and established Taylor as the person who fired the shots. It is now necessary to consider the admissibility of statements made by the victim shortly before his death and of the statements alleged to have been made by the defendant to the police detectives.

The doctor who attended Mr. McKenzie was called as a witness. He describes the extreme condition in which he found Mr. McKenzie and the treatment used in the vain attempt to save his life. This included the use of an oxygen tent. The doctor was first questioned as to McKenzie's knowledge that death was imminent. This was the doctor's testimony:

"A  When he arrived he had the first aid treatment at that time. The ambulance gave them his— they gave him oxygen by a portable oxygen mask and he had this on as he entered. And, we started to take care of him.

"He would push it aside periodically and say, 'let me die.' This was it.

"Q  Those were the only words he was saying?
"A  Well, these were the words that were said pertaining to this statement, yes.

"Q Now,—

"A I asked him other questions, like his name and things like that, yes.

"Q And he answered those?

"A He was coherent at the time. He was able to state his name and—

"Q But, he didn't say anything else with regard to any hope of recovery; he didn't say, 'I am not going to get well', or anything like that?

"A I can't recall of any.

"Q There were no words like that spoken?

"A No, I can't recall if any were spoken.

"Q He didn't say—he didn't say, 'I am going to die. Your medical care won't do me any good', or any words to that effect?

"A Well,—

"Q Maybe that isn't fair. I will withdraw it.

"The only words that he said were the ones that you quoted here and the best you can remember?

"A That is the best I can remember. You must remember that when we get a patient in critical condition we are not worried what they are saying pertinent to history and findings. We are interested in their welfare and that is what we work on until it becomes apparent. Those are the questions we do ask them.

"Q So, that you have no recollection of anything else like that said except what you have detailed to us?

"Let me just ask you this; doctor, do you believe that McKenzie knew he was going to die?

"A Well, I can't tell you what I believe, what McKenzie knew. This is impossible for anyone to tell unless they make the statement. I can't tell if he knew he was going to die.

"Q He made no expression to you at all that he knew he was going to die, indicating it to you?

"A. Other than the statement, 'Let me die'. If you want to apply that, 'I am going to die', then you can draw your own conclusions.

"Q Other than that he made no expression that would indicate to you that he though [sic] he was going to die soon?

"A No.

"Q That you can recall?

"A That's right.

"* * * * *

"THE COURT: Did you get the impression he thought he was going to die?

"THE WITNESS: The only thing I can say to that statement is the fact that he did say, 'Let me die.' He may have known. Whether he did think that, I can't say. He may have thought he was going to die. Or, 'Just let me die', may not have entered his mind. This is the only thing I can say in that respect, I am sure he must have known he he was critical in some respects, because of the emergency treatment that he had received and so forth.

"THE COURT: I am going to let it go for what it is worth, gentlemen."

The same testimony was repeated on cross-examination, but this is the evidence upon which the court ruled. The doctor was then questioned as to statements made by McKenzie and what follows is all that was said:

"Q (By Mr. Howlett) What question did you ask the deceased?

"A. The first—

"THE COURT: Your objections run through all of this.

"MR. CARNEY: Yes.

"THE WITNESS: The first question I asked him: 'Who shot you?' The patient replied, 'A man.'

"THE COURT: He what?

"THE WITNESS: He replied, 'A man.'

"Q (By Mr. Howlett) What further questions did you ask and what further answers did you receive?

"A And he was asked if he was masked and he said, 'No'. And then a description was asked that we asked him; what he looked like. And he gave a description of the man.

"Do you want the description, too?

"Q Yes.

"A He said that he was 30 years old, dark hair and medium size build. Then he stated that there was a gun battle and the man fled from the store and he stated later that they attempted to rob him.

"Q They attempted to rob him?

"A Yes, that's right. Now, this is all I could get out of him as far as conversation. You must remember he, at the time, was coherent, but then would lapse a little to semi-conciousness.

"Q How soon after he made this statement did the deceased die?

"A I don't have a record of that.

"Q Could you approximate?

"A About 15 minutes, probably."

The doctor was cross-examined on his testimony that *"they* attempted to rob him." (Italics ours.) The witness did not enlarge or detract from the evidence recited in any material respect. Other than the use of the words "they" and "rob" there is little of material consequence in this evidence of the statements of the dying man. There was other evidence of more positive character which we have recited to show that robbery

was the motive which brought Taylor and his companion to the McKenzie store.

■ The limits of the dying declaration exception to the hearsay rule are rather well defined. "Two conditions must exist to render a dying declaration admissible: (1) The declarant must have been *in extremis* and (2) it must have been made in the conscious belief that death was impending and without hope or expectation of recovery." *Mercep v. State Ind. Acc. Com.,* 167 Or 460, 469, 118 P2d 1061. Regarding the latter requirement it can be added that, "The mental state of the declarant, in respect to the belief entertained and the hope cherished, need not be established by express words, but may be inferred from the attending circumstances: [Citing cases]." *State v. Fuller,* 52 Or 42, 47, 96 P 456, 458. The same case also requires that "the admission of his declaration ought not to be reviewed, except in cases of an abuse of discretion."

■ The testimony of the attending doctor leaves no doubt that Mr. McKenzie was *in extremis* when the statements were made. The "attending circumstances" leave little doubt that the dying man was aware of his condition. The oxygen tent and blood transfusions being administered to the victim would have warned him of the seriousness of his wounds. Although his words, as repeated by the doctor, do not expressly say he knew death was upon him they do indicate an awareness that treatment was hopeless. It cannot be said the trial court abused its discretion in admitting the declaration for "what it is worth."

■ One other aspect of the "dying declaration" rule must be mentioned:

"* * *. On this point the authorities appear harmonious. Where but one deduction can reasonably be drawn from the testimony, and it is to the

effect that the declaration was made *in extremis,* under a sense of impending death, the court must admit the declaration; and its admission is conclusive upon the jury, which, under such circumstances, should be so instructed. But, if the predicate for the dying declaration appears doubtful, and of such character that men of average reason and prudence might draw different conclusions therefrom, the inquiry then becomes one of fact, and must finally be submitted to the jury." *State v. Doris,* 51 Or 136, 147, 94 P 44, 16 LRA NS 660.

In this case the court considered the question to be doubtful and carefully instructed the jury that it could not consider the alleged words of Mr. McKenzie until it had first determined that he spoke them with knowledge, on his part, of impending death. There was no error in the admission of this evidence.

The next assignment is directed at the admission of the testimony of two police detectives as to incriminating statements made to the detectives by the defendant. Before the detectives were permitted to tell the jury what the defendant had told them they were taken, separately, to the judge's chambers and, in the presence of the defendant, questioned with thoroughness by the prosecutor, the defendant's counsel and by the court. The trial judge only permitted the introduction of the evidence when he was satisfied that the statements were made voluntarily without threat, duress, coercion or promise. Substantial evidence had already been introduced that a crime had been committed as required by ORS 136.540(1). There was evidence to show that a human being had been killed and that some one or more persons were criminally responsible for the death. *State v. Jeannet,* 183 Or 354, 358, 192 P2d 983.

The testimony of the detectives remained unshaken

and uncontradicted that the defendant was not subjected to any pressure, harrassment or promise of leniency to induce him to speak. The witnesses separately testified they, as well as other officers, advised defendant that he was being held for first degree murder, that he was not required to talk and that if he did any incriminating statements would be used against him.

██ A confession which either actually or practically admits guilt is *prima facie* involuntary and imposes the burden on the state of showing that it was not the result of force or improper coercion. *State v. Howard,* 102 Or 431, 452, 203 P 311. In this instance the trial judge cautiously inquired into the entire subject matter out of the presence of the jury before permitting the jury to hear any of the testimony. There was nothing in the testimony of either officer which would cast doubt on the voluntary character of the admissions. The trial court correctly found the confession to be voluntary and submitted to the jury the admissions made by the defendant to the witnesses. It was then the burden of the jury to decide the weight and veracity to be accorded the evidence. *State v. Nunn,* 212 Or 546, 554, 321 P2d 356.

The statements attributed to the defendant disclosed that he and Taylor had visited the neighborhood earlier in the evening and at that time decided to return later and hold up the store. He entered the store with Taylor. Each carried a gun but the defendant's was not loaded. Taylor accosted the victim and defendant went to the light switch to turn out the lights. While he was engaged in that act the shooting commenced. He attempted to get behind the counter and reach the victim but was shot in the hand, forcing him to drop

his gun. At that point the defendant and Taylor fled; the latter badly wounded. The defendant was able to get Taylor into the latter's car, which was used by them to reach the store and which had been parked about a block or so away. He took Taylor to the home of Taylor's mother, as we have already told, and then fled. Actually, the confession adds little to the inferences that could have been readily drawn from the other evidence we have mentioned. We relate it only as it bears on the motion made by the defendant, after he had rested without submitting any evidence, for a directed verdict of not guilty. In his brief the defendant now attempts to refute the testimony of the officers and attack their veracity. The defendant had an opportunity to do so before the jury and declined. We can no more consider the statements made in that part of his brief, which is outside the record of the case, than we have considered other statements in the brief that are admissions of material facts which the state had been required to prove at the trial. We have kept our consideration of this issue strictly to the evidence presented at the trial.

■ There is really no serious question as to the sufficiency of the evidence. We find no reason to repeat, in different words, what we have already set forth at considerable length. No actual robbery took place, as the shooting occurred before any property of the victim was taken. However, the fact of the shooting itself raises the inference that Taylor and defendant entered the store with at least one gun in hand, ready and available for use, that Taylor, at least, if not defendant, was ready and willing to use force if resisted and that they used the gun to attempt to force the victim to yield his property. That evidence, and the fair inferences, was sufficient to show an attempt to rob.

1 Wharton, Criminal Law and Practice (Anderson's ed) 156 et seq., § 74; *State v. Milo et al.,* 126 Or 238, 244, 269 P 225. Despite statements in defendant's brief to the contrary, the evidence does not indicate an intent to enter the McKenzie store to sell the proprietor the gun, to show it to him or for any similar purpose. There was no evidence that Taylor had any previous acquaintance with McKenzie which might raise a remotely conceivable inference of malice. The evidence, disregarding the dying declaration and admission of defendant, warrants strong inferences of the commission and nature of the crime and the defendant's direct participation in it. The court properly submitted the case to the jury.

■ The defendant charges in assignment designated four that the court received irrelevant evidence. In his argument on this claim he contends that the evidence as to Taylor's participation in the acts charged should not have been received. The obvious answer, is, of course, that the state presented evidence for the jury to weigh as to the defendant's connection with the criminal acts of Taylor. If the jury found, as it did, that the defendant was acting in concert with Taylor then it follows that the defendant was equally responsible with Taylor. "The law declares that each confederate is liable for every act of his accomplices in the execution of a common purpose in violation of the law." *State v. Brown,* 113 Or 149, 152, 231 P 926.

■ Assignment five complains of the testimony of two witnesses who identified the defendant as having purchased beer in a store across the street from the McKenzie store earlier in the evening of the crime. The evidence was admissible to place the defendant in the neighborhood where the crime was committed. The jury may have given little weight to the identification,

but it was admissible. *State v. Lanegan,* 192 Or 691, 696, 236 P2d 438; 2 Wigmore, Evidence (3rd ed), § 660.

■ The last assignment is directed at evidence which purported to identify an unloaded gun found near the light switch in the McKenzie store as one which had been stolen from a store in Albany, Oregon, several days before November 14, 1957. After the evidence was partially received the court ordered the testimony stricken and emphatically directed the jury to disregard the evidence. We must assume that the jury adhered to this direction. *State v. Cunningham,* 173 Or 25, 58, 144 P2d 303; *State v. Lanegan,* supra.

This completes our consideration of each of the assignments made by the defendant. Because the defendant is not represented by counsel we have been impelled to and have examined the record to ascertain if any other error can be found. The seriousness of the offense and the extent of the penalty require our consideration of any possible error that could have been prejudicial to the defendant, whether he has called attention to it or not. At the trial the defendant was energetically and capably defended by two counsel appointed by the court. The experienced and able trial judge preserved to the defendant every possible right. His instructions were clear, complete and exceedingly fair to every issue presented by the defendant. We conclude that the defendant received an emminently fair and impartial trial and the judgment should be affirmed.