Argued April 17, affirmed May 18, petition for rehearing denied
August 8, petition for review allowed October 25, remanded
October 27 (see State v. Fry Roofing), former opinion
adhered to November 24, 1972
See later issue Oregon Reports, Court of Appeals

# STATE OF OREGON, *Respondent, v.*
# PETE ACHZIGER, *Appellant.*

497 P2d 383

*Graham Walker*, Portland, argued the cause and filed the briefs for appellant.

*Al J. Laue*, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and John W. Osburn, Solicitor General, Salem.

Before SCHWAB,* Chief Judge, and LANGTRY and THORNTON, Judges.

LANGTRY, J.

Defendant was indicted for first degree murder of his wife. He pleaded not guilty and not guilty by reason of insanity and, in a trial to the court, was convicted of voluntary manslaughter. On appeal he contends (1) the court erred in allowing testimony of declarations made by the deceased after she had suffered the fatal injury; (2) that similar declarations contained in hospital records should not have been admitted into evidence; (3) defendant's plea of insanity should have been allowed; and (4) defendant was denied a fair trial because the state suppressed evidence essential to his defense.

An emergency rescue team was summoned to the Achziger residence by defendant. It found deceased lying at the bottom of the basement stairs. Preliminary tests showed a possible paralysis of the limbs resulting from a serious back or neck injury. She ap-

---

* Schwab, C.J., did not participate in this decision.

peared rational and coherent and stated she felt no pain.

The state's case rested primarily on statements made by the deceased en route to the hospital, in the emergency room, and the following day in the hospital, in which she recounted how her husband, the defendant, had attacked her. She died three days later. Deceased was a registered nurse.

(1). The state offered the testimony of six individuals to whom the deceased had made statements implicating the defendant. These hearsay declarations were received under the exception to the hearsay rule for "dying declarations."

The limits of the dying declaration exception to the hearsay rule are defined in case law and codified in ORS 41.900(4).

> "* * * Two conditions must exist to render a dying declaration admissible: (1) The declarant must have been *in extremis* and (2) it must have been made in the conscious belief that death was impending and without hope or expectation of recovery * * *." *Mercep v. State Ind. Acc. Com.*, 167 Or 460, 469, 118 P2d 1061 (1941).

The mental state of the declarant need not be established by express words, but may be inferred from the attending circumstances. *State v. Fuller*, 52 Or 42, 96 P 456 (1908). " '[T]he admission of * * * [dying] declaration ought not to be reviewed, except in cases of an abuse of discretion.' " *State v. Brewton*, 220 Or 266, 276, 344 P2d 744 (1959).

The uncontroverted evidence is that deceased's condition was critical. Defendant's primary contention in challenging the dying declarations is that deceased had no fear of death when she made them.

Dushar K. Nag, M.D., a neurosurgeon, testified that he treated deceased when she arrived at Bess Kaiser Hospital, July 31, 1970. At that time he diagnosed a complete transection of the spinal cord; he commented in his testimony that he had never seen a neck fracture as severe as deceased's. His prognosis was grim since the paralysis caused by the spinal injury eventually affects the respiratory system, resulting in death.

Further testimony from Dr. Nag reflected the deceased's awareness of her condition:

"Q  [District Attorney] Did she indicate to you, Doctor, that she knew the gravity of her particular situation?
"A  Yes. She did. Actually she had asked me a few times.
"* * * * * [Defense counsel objected—overruled.]
"A  (continuing) On the same night of the injury she asked me whether she was going to live and whether there would be any recovery of the power in the limb muscles. And so at that time of course, I, you know, reassured her, said there was a chance and sometimes people do recover.
"But next morning she asked and she didn't even listen, you know, wait for my answer. She said, 'I know I will never live.' "

The doctor then testified that on the night of the injury she told him how the injury had come about.

Walter Berlin, M.D., a physician who had employed deceased in his office for approximately three years, testified that on the afternoon of August 1:

"* * *[T]he decedent's brother and myself were with her and had completed some business transactions which she had wanted to accomplish, when the decedent's brother asked her whether she was

well enough to relate what had happened. And she said yes, that she was and she wanted to relate what had happened.

"And because of the — in our opinion, the implications inherent to such a statement, I took it upon myself to call the private duty nurse who was in attendance upon her to also be present during this recitation. Mrs. Achziger explained that her husband had taken one of their sons, Gary, to a baseball game, as I recall, and had returned. And upon his return he related to her that he was afraid that this boy had been smoking, and that he had found some cigarettes in the basement there and wanted his wife, Harriet, to accompany him to the basement and he would show it to her.

"According to Mrs. Achziger, she related that she didn't see any reason why she had to go downstairs, but he was quite insistent so she went downstairs with him to the basement to oblige him. He went over to a couch of some sort, as she related, and looked under the mattress for some cigarettes, but related that he couldn't find any. They weren't there, and Mrs. Achziger then related, that she started to leave the basement and climb the stairs when she was grasped from behind by Mr. Achziger and he forced her head down between her knees. Her next recollection was that she was lying flat on the floor on her back and that her husband was pounding her head on the cement floor of the basement. She also related that she realized that she had no idea where her arms or legs were, and had the feeling that they were all akimbo. She further stated that she pleaded with him repeatedly, saying, 'Please, don't kill me; please don't kill me,' and that he finally stopped.

"She then asked him to call an ambulance and said that, to him, her husband, that she would do the same thing for him. He left the basement and he returned a short time later and he threw some clothes down the basement steps. And I have a recollection that she said that he also threw a

wicker laundry basket down and then he left and she had assumed that he had gone to call for help."

Harold Denver Paxton, M.D., another attending neurosurgeon, testified that he treated the deceased in the emergency room of Bess Kaiser Hospital. He informed her at the time that her spinal cord had been severely damaged and that the "chances of her getting over this neurological deficit [the paralysis] were not good." When asked whether, as a registered nurse, the deceased would be aware of the seriousness of the injury she had sustained, the doctor testified:

"Well, I'm sure she would have had experience with patients with this disorder. They are not rare. They are hospitalized over long periods and they excite great horror and curiosity. I cannot imagine she could have gotten to her place without seeing a number of patients with severe cervical fracture."

His subsequent testimony on cross-examination was somewhat equivocal as to whether a person with a neck injury such as decedent's would be aware of "impending death."

■■ The evidence showing decedent's knowledge of her condition, her experience and training as a registered nurse, and her statement "I know I will never live," was sufficient to create at least a fact question that deceased was conscious of impending death and without hope of recovery when she made the above quoted statement to Dr. Berlin. As trier of fact, the court could have reasonably concluded from the evidence that deceased had the requisite mental state. We will not disturb that finding. *Mercep v. State Ind. Acc. Com.,* supra; *State v. Brewton,* supra, 220 Or at 277. A much closer question arises in regard to the statements made by deceased to the ambulance driver and

a police officer in the emergency room, as there is little evidence of whether she was then aware of the critical nature of the injury. Regardless, in view of deceased's training, experience and her later statements, it was for the court to determine whether she had a realization of her critical condition at that time. Moreover, these statements substantially accorded with those made to Dr. Berlin and thus it can be argued they were only cumulative.

(2). Defendant also objected to the admission of a hospital record containing numerous reports, four of which included hearsay statements of the deceased. These are:

(a) A preliminary examination report from the emergency clinic which, in part, relates:

"44-yr old lady * * * beaten by husband."

(b) "Progress Notes" signed by Dr. Paxton, stating

"44 yr old lady beaten by husband—head pulled down between knees in flexion injury."

(c) A medical history signed by Dr. Nag, which relates:

"This patient was admitted on 7/31/70 at 7:45 p.m. The patient stated that about an hour ago her husband forcibly pushed her head in between her knees until she lost consciousness. When she regained consciousness she found herself on the floor in supine position and she was unable to move her limbs * * *."

(d) A substantially similar history by Dr. Paxton.

ORS 41.690 provides:

"A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its

identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

■■ Defendant's argument is directed at the third requirement of the statute, that "the sources of information * * * were such as to justify its admission." He contends that in order to admit the statements of decedent contained in the hospital record they must qualify as "dying declarations" or come under some other exception to the hearsay rule, and that these statements do not. For the reasons specified in (1), supra, we hold that as to the medical histories ((c) and (d)) admissibility was properly a matter for the trial court's discretion and it did not violate that discretion. Moreover, we believe that these statements come within another recognized exception to the hearsay rule: that for "declarations of bodily condition to a physician consulted for treatment." *See Mayor v. Dowsett,* 240 Or 196, 229, 400 P2d 234 (1965); *see, generally,* McCormick, Evidence 563, § 266 (1954).

■ On the other hand, the two reports ((a) and (b)) which relate the statement, "Beaten by husband," do not appear, in their controversial parts, to satisfy the business record statute or otherwise qualify for exception to the hearsay rule. *See,* McCormick, supra, §§ 266, 290. However, if it was error to admit them, the error was not prejudicial since the histories and direct testimony of the doctors, which were properly admitted, recounted substantially the same if not a more vivid description of the assault.

■ (3). Defendant contends that the court erred in not finding him innocent by reason of insanity. De-

fendant produced two psychiatrists who testified that based upon a history and record presented to them by defendant they were of the opinion defendant did not know right from wrong at the time of the act in question. Both of the doctors, when presented with a hypothetical question based upon the events as described in decedent's dying declarations, stated that an individual conducting himself in the manner described would know the nature, extent and quality of his act and the difference between right and wrong. Defendant's prime contention under this assignment of error is that if the dying declarations are inadmissible the factual basis of the hypothetical question would be erroneous and, thus, the opinions inadmissible, leaving the opinion testimony of insanity standing unopposed. We have held the evidence admissible; therefore, this assignment has no merit. The balance of defendant's arguments under this assignment of error do not merit consideration.

■ (4). In his final assignment of error the defendant contends he was denied a fair trial because the state withheld evidence found at the scene of the crime. Defendant brought these contentions before the trial court in a hearing held prior to sentencing. It is not clear from the record what the form of defendant's motion was or the nature of the relief asked.

At the hearing the following transpired:

"[Defense Counsel] * * * The second part of my motion to produce involves a pillow, pillowcase, or pillowcases which were taken from the scene and analyzed, and I would ask the District Attorney— or Mr. Price—again if he has any information—just that I feel would be of significance in sentencing —if he has any information concerning these pillowcases, reports of examinations or anything. Does

the District Attorney have any information regarding that?

"THE COURT: All right, Mr. Price, can you reply to counsel's inquiry?

"MR. PRICE: Yes, Your Honor, I have. I wasn't even actually aware of these pillows until this motion came in. I checked, however, with the Sheriff's office, and I believe there are two pillows, if for any reason they seem to be of any significance. They were taken by the investigating officers at the removal of Mrs. Achziger from the home. They are negative for blood or any other stains, but I have them. They are still in the original cellophane bag, for that matter.

"MR. WALKER: I believe it would be of great significance as to where they were taken from. In other words, if taken from the foot of the stairs, I think they're highly evidentiary. He thought he tripped over an object and the pillow dropped and he dropped her.

"THE COURT: I don't know whether Mr. Price can answer that question or not.

"MR. PRICE: I cannot, Your Honor. I mean, as I said — I thought this case had been tried, but as I said, I do have the pillows, but as far as —

"THE COURT: Well, there was evidence in the record, I think from the defendant here, that he tripped over a pillow. Is that not right?

"MR. PRICE: I think some of the pictures reflected, Your Honor, that were introduced — of course I haven't seen them since the trial — I think they show the items of clothes or where any pillows may have been located.

"THE COURT: Anyway, those are available for your inspection, Mr. Walker. But like the District Attorney indicated — I heard the case without a jury, as you well recall. You waived a jury, and I reluctantly heard it, and I recall some testimony

about it. *But I don't think, as far as the being of any — serving any purpose for any motion for a new trial, I don't see that it's of any assistance to the Court."* (Emphasis supplied.)

The court's statement that this evidence would have had no influence on its decision conclusively establishes that the evidence was not exculpatory or material to the defense, so as to warrant reversal. See *Brady v. Maryland,* 373 US 83, 87, 83 S Ct 1194, 10 L Ed 2d 215 (1963); Annotation, 34 ALR 3d 16, 52, § 6 (1970). Defendant's contention as to "reports of examinations, or anything" being suppressed is speculation.

Affirmed.